**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STATE OF CALIFORNIA; STATE OF
COLORADO; STATE OF
CONNECTICUT; STATE OF
DELAWARE; STATE OF HAWAII;
STATE OF MAINE; STATE OF
MINNESOTA; STATE OF NEW JERSEY;
STATE OF NEW MEXICO; STATE OF
NEVADA; STATE OF NEW YORK;
STATE OF OREGON;
COMMONWEALTH OF VIRGINIA;
STATE OF ILLINOIS; STATE OF
MARYLAND; DANA NESSEL,
ATTORNEY GENERAL, ON BEHALF OF
THE PEOPLE OF MICHIGAN; STATE OF
WISCONSIN; STATE OF
MASSACHUSETTS; STATE OF
VERMONT; STATE OF RHODE ISLAND,
                    *Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, in his official
capacity as President of the United
States of America; UNITED STATES
OF AMERICA; UNITED STATES
DEPARTMENT OF DEFENSE; MARK T.
ESPER, in his official capacity as
Acting Secretary of Defense; RYAN
D. MCCARTHY, senior official

No. 19-16299

D.C. No.
4:19-cv-00872-
HSG

performing the duties of the Secretary of the Army; RICHARD V. SPENCER, in his official capacity as Secretary of the Navy; HEATHER WILSON, in her official capacity as Secretary of the Air Force; UNITED STATES DEPARTMENT OF THE TREASURY; STEVEN TERNER MNUCHIN, in his official capacity as Secretary of the Department of the Treasury; U.S. DEPARTMENT OF THE INTERIOR; DAVID BERNHARDT, in his official capacity as Secretary of the Interior; U.S. DEPARTMENT OF HOMELAND SECURITY; CHAD F. WOLF, in his official capacity as Acting Secretary of Homeland Security,

*Defendants-Appellants.*

STATE OF CALIFORNIA; STATE OF
NEW MEXICO,

*Plaintiffs-Appellants*,

v.

DONALD J. TRUMP, in his official
capacity as President of the United
States of America; UNITED STATES
OF AMERICA; UNITED STATES
DEPARTMENT OF DEFENSE; MARK T.
ESPER, in his official capacity as
Acting Secretary of Defense; RYAN
D. MCCARTHY, senior official
performing the duties of the
Secretary of the Army; RICHARD V.
SPENCER, in his official capacity as
Secretary of the Navy; HEATHER
WILSON, in her official capacity as
Secretary of the Air Force; UNITED
STATES DEPARTMENT OF THE
TREASURY; STEVEN TERNER
MNUCHIN, in his official capacity as
Secretary of the Department of the
Treasury; U.S. DEPARTMENT OF THE
INTERIOR; DAVID BERNHARDT, in his
official capacity as Secretary of the
Interior; U.S. DEPARTMENT OF
HOMELAND SECURITY; CHAD F.
WOLF, in his official capacity as
Acting Secretary of Homeland
Security,

*Defendants-Appellees.*

No. 19-16336

D.C. No.
4:19-cv-00872-
HSG

OPINION

Appeal from the United States District Court
for the Northern District of California
Haywood S. Gilliam, Jr., District Judge, Presiding

Argued and Submitted November 12, 2019
San Francisco, California

Filed June 26, 2020

Before:  Sidney R. Thomas, Chief Judge, and Kim McLane
Wardlaw and Daniel P. Collins, Circuit Judges.

Opinion by Chief Judge Sidney R. Thomas;
Dissent by Judge Collins

# SUMMARY[*]

## Appropriations

The panel affirmed the district court's judgment holding that budgetary transfers of funds for the construction of a wall on the southern border of the United States in California and New Mexico were not authorized under the Department of Defense Appropriations Act of 2019.

Section 8005 and Section 9002 of the Act (collectively "Section 8005") was invoked to transfer $2.5 billion of Department of Defense funds appropriated for other purposes to fund border wall construction. Sixteen states, including California and New Mexico, filed suit challenging the Executive Branch's funding of the border wall. The district court granted California and New Mexico's motion for partial summary judgment, and issued declaratory relief, holding the Section 8005 transfer of funds as to the El Centro and El Paso sectors unlawful.

The panel held that California and New Mexico established the requisite Article III standing to challenge the federal defendants' actions.

Concerning the injury in fact element of standing, the panel held that California and New Mexico alleged that the actions of the federal defendants will cause particularized and concrete injuries in fact to the environment and wildlife of their respective states as well as to their sovereign interests in

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

enforcing their environmental laws. First, the panel held that California and New Mexico each provided sufficient evidence, if taken as true, that would allow a reasonable fact-finder to conclude that both states would suffer injuries in fact to their environmental interests, and in particular, to protect endangered species within their borders. Second, the panel also held that California and New Mexico demonstrated that border wall construction injured their quasi-sovereign interests by preventing them from enforcing their environmental laws.

Concerning the causation element for standing, the panel held that California alleged environmental and sovereign injuries that were fairly traceable to the federal defendants' conduct. The panel held that with respect to most of the environmental injuries, causation was apparent. The panel also concluded that the causation requirement was likewise satisfied for the injuries to California's and New Mexico's quasi-sovereign interests.

Concerning the redressability element of standing, the panel held that a ruling in California and New Mexico's favor would redress their harms. Without the Section 8005 funds, the Department of Defense would have inadequate funding to finance construction of the projects, and this would prevent both the alleged and environmental and sovereign injuries.

The panel held that California and New Mexico had the right to challenge the transfer of funds under the Administrative Procedure Act ("APA"). Specifically, the panel held that Section 8005 imposed certain obligations upon the Department of Defense, which it did not satisfy. The panel further held that California and New Mexico, as aggrieved parties, could pursue a remedy under the APA, as

long as they fell within Section 8005's zone of interests. The panel held that California and New Mexico were suitable challengers because their interests were congruent with those of Congress and were not inconsistent with the purposes implicit in the statute. The panel concluded that California and New Mexico easily fell within the zone of interests of Section 8005.

The panel held that Section 8005 did not authorize the Department of Defense's budgetary transfer to fund construction of the El Paso and El Centro Sectors. Specifically, the panel concluded that the district court correctly determined that the border wall was not an unforeseen military requirement, and that funding for the wall had been denied by Congress. Absent such statutory authority, the Executive Branch lacked independent constitutional authority to transfer the funds at issue here. The panel concluded that the transfer of funds was unlawful, and affirmed the district court's declaratory judgment to California and New Mexico.

Finally, the panel declined to reverse the district court's denial of California and New Mexico's request for permanent injunctive relief, without prejudice to renewal.

Judge Collins dissented. He agreed that at least California established Article III standing, but would hold that the States lacked any cause of action to challenge the transfer of funds under the APA or otherwise. Even assuming that they had a cause of action, Judge Collins would conclude that the transfers were lawful and reverse the district court's partial judgment for the States and remand for entry of partial summary judgment in favor of the defendants.

**COUNSEL**

H. Thomas Byron III (argued), Anne Murphy, and Courtney L. Dixon, Appellate Staff; Hashim M. Mooppan and James M. Burnham, Deputy Assistant Attorneys General; Joseph H. Hunt, Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellants/Cross-Appellees.

Dror Ladin (argued), Noor Zafar, Jonathan Hafetz, Hina Shamsi, and Omar C. Jadwat, American Civil Liberties Union Foundation, New York, New York; Cecillia D. Wang, American Civil Liberties Union Foundation, San Francisco, California; Mollie M. Lee and Christine P. Sun, American Civil Liberties Union Foundation of Northern California Inc., San Francisco, California; David Donatti and Andre I. Segura, American Civil Liberties Union Foundation of Texas, Houston, Texas; Sanjay Narayan and Gloria D. Smith, Sierra Club Environmental Law Program, Oakland, California; for Plaintiffs-Appellees.

Douglas N. Letter (argued), Todd B. Tatelman, Megan Barbero, Josephine Morse, and Kristin A. Shapiro, United States House of Representatives, Washington, D.C.; Carter G. Phillips, Virginia A. Seitz, Joseph R. Guerra, and Christopher A. Eiswerth, Sidley Austin LLP, Washington, D.C.; for Amicus Curiae United States House of Representatives.

James F. Zahradka II (argued), Brian J. Bilford, Sparsh S. Khandeshi, Heather C. Leslie, Lee I. Sherman, and Janelle M. Smith, Deputy Attorneys General; Michael P. Cayaban, Christine Chuang, and Edward H. Ochoa, Supervising Deputy Attorneys General; Robert W. Byrne, Sally Magnani, and Michael L. Newman, Senior Assistant Attorneys General;

Xavier Becerra, Attorney General; Attorney General's Office, Oakland, California; Jennie Lusk, Civil Rights Bureau Chief; Nicholas M. Sydow, Civil Appellate Chief; Tania Maestas, Chief Deputy Attorney General; Hector Balderas, Attorney General; Office of the Attorney General, Santa Fe, New Mexico; for Amici Curiae States of California and New Mexico.

Christopher J. Hajec, Immigration Reform Law Institute, Washington, D.C.; Lawrence J. Joseph, Washington, D.C.; for Amicus Curiae United States Representative Andy Barr.

John W. Howard, George R. Wentz Jr., Richard Seamon, and D. Colton Boyles, Davillier Law Group LLC, Sandpoint, Idaho, for Amicus Curiae State of Arizona House of Representatives Federal Relations Committee.

Richard P. Hutchison, Landmark Legal Foundation, Kansas City, Missouri; Michael J. O'Neill and Matthew C. Forys, Landmark Legal Foundation, Leesburg, Virginia; for Amici Curiae Angel Families, Sabine Durden, Don Rosenberg, Brian McAnn, Judy Zeito, Maureen Mulroney, Maureen Laquerre, Dennis Bixby, and Advocates for Victims of Illegal Alien Crimes.

Douglas A. Winthrop, Arnold & Porter Kaye Scholer LLP, San Francisco, California; Irvin B. Nathan, Robert N. Weiner, Andrew T. Tutt, Kaitlin Konkel, and Samuel F. Callahan, Arnold & Porter Kaye Scholer LLP, Washington, D.C.; for Amici Curiae Former Members of Congress.

Elizabeth B. Wydra, Brianne J. Gorod, Brian R. Frazelle, and Ashwin P. Phatak, Constitutional Accountability Center, Washington, D.C., for Amici Curiae Federal Courts Scholars.

Steven A. Zalesin, Adeel A. Mangi, and Amir Badat, Patterson Belknap Webb & Tyler LLP,  New York, New York, for Amici Curiae 75 Religious Organizations.

Harold Hongju Koh, Peter Gruber Rule of Law Clinic, Yale Law School, New Haven, Connecticut; Kathleen R. Hartnett, Boies Schiller Flexner LLP, San Francisco, California; Phillip Spector, Messing & Spector LLP, Baltimore, Maryland; for Amici Curiae Former United States Government Officials.

Samuel F. Daughety and Suzanne R. Schaeffer, Dentons US LLP, Washington, D.C.; Joshua O. Rees, Acting Attorney General, Tohono O'Odham Nation, Sells, Arizona; for Amicus Brief Tohono O'Odham Nation.

## OPINION

THOMAS, Chief Judge:

This appeal presents the question of whether the Department of Defense Appropriations Act of 2019 authorized the Department of Defense ("DoD") to make budgetary transfers from funds appropriated by Congress to it for other purposes in order to fund the construction of a wall on the southern border of the United States in California and New Mexico. We conclude that the transfers were not authorized by the terms of the Act, and we affirm the judgment of the district court.[1]

I

The President has long supported the construction of a border wall on the southern border between the United States and Mexico. Since the President took office in 2017, however, Congress has repeatedly declined to provide the amount of funding requested by the President.

The debate over border wall funding came to a head in December of 2018. During negotiations to pass an appropriations bill for the remainder of the fiscal year, the President announced that he would not sign any legislation that did not allocate substantial funds to border wall construction. On January 6, 2019, the White House requested $5.7 billion to fund the construction of approximately

---

[1] There are companion appeals concerning some of the same issues in *Sierra Club, et. al. v. Trump et. al.*, Nos. 19-16102 and 19-16300. Those appeals will be the subject of a separate opinion.

234 miles of new physical barrier.[2]   Budget negotiations concerning border wall funding reached an impasse, triggering the longest partial government shutdown in United States history.

After 35 days, the government shutdown ended without an agreement to provide increased border wall funding in the amount requested by the President.  On February 14, 2019, Congress passed the Consolidated Appropriations Act of 2019 ("CAA"), which included the Department of Homeland Security Appropriations Act for Fiscal Year 2019, Pub. L. No. 116-6, div. A, 133 Stat. 13 (2019).    The CAA appropriated only $1.375 billion for border wall construction, specifying that the funding was for "the construction of primary pedestrian fencing . . . in the Rio Grande Valley Sector."  *Id.* § 230(a)(1).  The President signed the CAA into law the following day.

The President concurrently issued a proclamation under the National Emergencies Act, 50 U.S.C. §§ 1601–1651, "declar[ing] that a national emergency exists at the southern border of the United States."  Proclamation No. 9844, 84 Fed. Reg. 4949 (Feb. 15, 2019).[3]  An accompanying White House Fact Sheet explained that the President was "using his legal authority to take Executive action to secure additional resources" to build a border wall, and it specified that "the

---

[2] Some form of a physical barrier already exists at the site of some of the construction projects.  In those places, construction would reinforce or rebuild the existing portions.

[3] Subsequently, Congress adopted two joint resolutions terminating the President's emergency declaration pursuant to its authority under 50 U.S.C. § 1622(a)(1).  The President vetoed each resolution, and Congress failed to override these vetoes.

Administration [had] so far identified up to $8.1 billion that [would] be available to build the border wall once a national emergency [was] declared and additional funds [were] reprogrammed." The Fact Sheet identified several funding sources, including $2.5 billion of Department of Defense ("DoD") funds that could be transferred to provide support for counterdrug activities of other federal government agencies under 10 U.S.C. § 284 ("Section 284").[4] Executive Branch agencies began using the funds identified by the Fact Sheet to fund border wall construction. On February 25, the Department of Homeland Security ("DHS") submitted to DoD a request for Section 284 assistance to block drug smuggling corridors. In particular, it requested that DoD fund "approximately 218 miles" of wall using this authority, comprised of numerous projects, including the El Centro Sector Project 1 in California and the El Paso Sector Project 1 in New Mexico, as relevant to this case. On March 25, Acting Secretary of Defense Patrick Shanahan approved three border wall construction projects: Yuma Sector Projects 1 and 2 in Arizona and El Paso Sector Project 1 in New Mexico. On May 9, Shanahan approved four more border wall construction projects: El Centro Sector Project 1 in California and Tucson Sector Projects 1–3 in Arizona.

---

[4] Section 284 authorizes the Secretary of Defense to "provide support for the counterdrug activities . . . of any other department or agency of the Federal Government" if it receives a request from "the official who has responsibility for the counterdrug activities." 10 U.S.C. §§ 284(a), 284(a)(1)(A). The statute permits, among other things, support for "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States." *Id.* § 284(b)(7). DoD's provision of support for other agencies pursuant to Section 284 does not require the declaration of a national emergency.

Because these projects were undertaken to construct barriers and roads in furtherance of border security, Acting Secretary of Homeland Security Kevin McAleenan invoked the authority granted to him by Section 102(c) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, Div. C, § 102(c), 110 Stat. 3009-546, 3009-554 (1996) (codified as amended as a note to 8 U.S.C. § 1103), to "waive all legal requirements" that would otherwise apply to the border wall construction projects "to ensure . . . expeditious construction." 84 Fed. Reg. 17185-01 (April 24, 2019). On April 24, with respect to the El Paso Sector, he "waive[d] in their entirety, with respect to the construction of physical barriers and roads" a long list of statutes, "including all federal, state, or other laws, regulations, and legal requirements of, deriving from, or related to the subject of" "[t]he National Environmental Policy Act" "(42 U.S.C. 4321 et seq.)," "the Endangered Species Act" "(16 U.S.C. 1531 et seq.)," "the Federal Water Pollution Control Act (commonly referred to as the Clean Water Act (33 U.S.C. 1251 et seq.))," and "the Clean Air Act (42 U.S.C. 7401 et seq.)." *Id.* He executed a similar Section 102(c) waiver with respect to the El Centro Sector on May 15. 84 Fed. Reg. 21800-01 (May 15, 2019).

At the time Shanahan authorized these border wall construction projects, the counter-narcotics support account contained only $238,306,000 in unobligated funds, or less than one tenth of the $2.5 billion needed to complete those projects. To provide the support requested, Shanahan invoked the budgetary transfer authority found in Section 8005 of the 2019 DoD Appropriations Act to transfer funds from other DoD appropriations accounts into the Section 284 Drug Interdiction and Counter-Drug Activities-Defense appropriations account.

For the first set of projects, Shanahan transferred $1 billion from Army personnel funds. For the second set of projects, Shanahan transferred $1.5 billion from "various excess appropriations," which contained funds originally appropriated for purposes such as modification of in-service missiles and support for U.S. allies in Afghanistan.

As authority for the transfers, DoD specifically relied on Section 8005 and Section 9002 of the Department of Defense Appropriations Act of 2019, Pub. L. No. 115-245, 132 Stat. 2981 (2018) ("Section 8005").[5]

Section 8005 provides, in relevant part, that:

> Upon determination by the Secretary of Defense that such action is necessary in the national interest, he may, with the approval of the Office of Management and Budget, transfer not to exceed $4,000,000,000 of working capital funds of the Department of Defense or funds made available in this Act to the Department of Defense for military functions (except military construction) between such appropriations or funds or any subdivision thereof, to be merged with and to be available for the same purposes, and for the

---

[5] For simplicity, because the transfer authorities are both subject to Section 8005's substantive requirements, this opinion refers to these authorities collectively as Section 8005, as did the district court and the motions panel. Our holding in this case therefore extends to both the transfer of funds pursuant to Section 8005 and Section 9002.

same time period, as the appropriation or fund
to which transferred.[6]

Section 8005 also explicitly limits when its authority can
be invoked: "*Provided*, That such authority to transfer may
not be used unless for higher priority items, based on
unforeseen military requirements, than those for which
originally appropriated and in no case where the item for
which funds are requested has been denied by the Congress."

Although Section 8005 does not require formal
congressional approval of transfers, historically DoD had
adhered to a "gentleman's agreement," by which it sought
approval from the relevant congressional committees before
transferring the funds. DoD deviated from this practice
here—it did not request congressional approval before
authorizing the transfer. Further, the House Committee on
Armed Services and the House Committee on Appropriations
both wrote letters to DoD formally disapproving of the
reprogramming action after the fact. Moreover, with respect
to the second transfer, Shanahan expressly directed that the
transfer of funds was to occur "without regard to comity-

---

[6] Section 9002 provides that: "Upon the determination of the
Secretary of Defense that such action is necessary in the national interest,
the Secretary may, with the approval of the Office of Management and
Budget, transfer up to $2,000,000,000 between the appropriations or funds
made available to the Department of Defense in this title: *Provided*, That
the Secretary shall notify the Congress promptly of each transfer made
pursuant to the authority in this section: *Provided further*, That the
authority provided in this section is in addition to any other transfer
authority available to the Department of Defense and is subject to the
same terms and conditions as the authority provided in section 8005 of
this Act."

based policies that require prior approval from congressional committees."

In the end, Section 8005 was invoked to transfer $2.5 billion of DoD funds appropriated for other purposes to fund border wall construction.

## II

On February 18, 2019, sixteen states,[7] including California and New Mexico, filed a lawsuit challenging the Executive Branch's funding of the border wall. The States pled theories of violation of the constitutional separation of powers, violation of the Appropriations Clause, *ultra vires* action, violations of the Administrative Procedure Act ("APA"), and violations of the National Environmental Policy Act ("NEPA"). The next day, Sierra Club and the Southern Border Communities Coalition filed a separate action challenging the same border wall funding.[8]

---

[7] Specifically, the action was filed by the following states: California, Colorado, Connecticut, Delaware, Hawai'i, Illinois, Maine, Maryland, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, the Commonwealth of Virginia, and Attorney General Dana Nessel on behalf of the People of Michigan. The complaint was later amended to add the following states: Rhode Island, Vermont, Wisconsin, and the Commonwealth of Massachusetts. State parties are collectively referenced as "the States."

[8] Both lawsuits named as defendants Donald J. Trump, President of the United States, Patrick M. Shanahan, former Acting Secretary of Defense, Kirstjen M. Nielsen, former Secretary of Homeland Security, and Steven Mnuchin, Secretary of the Treasury in their official capacities, along with numerous other Executive Branch officials (collectively referenced as "the Federal Defendants").

The States subsequently filed a motion requesting a preliminary injunction to enjoin the transfer of funds to construct a border wall in New Mexico's El Paso Sector. The district court held that New Mexico had standing, but it denied without prejudice the preliminary injunction motion. The court based part of its reasoning on the fact that it had already imposed a preliminary injunction in the *Sierra Club* action such that the grant of a preliminary injunction in favor of the States would be duplicative. California subsequently filed another motion requesting a preliminary injunction to enjoin the transfer of funds to construct a border wall in California's El Centro Sector.

California and New Mexico then moved for partial summary judgment on their declaratory judgment action as to the El Centro and El Paso Sectors, and additionally moved for a permanent injunction to enjoin funding the construction of these sectors. The Federal Defendants filed a cross-motion for summary judgment on all claims. The district court granted California and New Mexico's motion for partial summary judgment, and issued declaratory relief, holding the Section 8005 transfer of funds as to the El Centro and El Paso sectors unlawful. The district court denied the Federal Defendants' motion for summary judgment.

The court also denied California and New Mexico's motion for a permanent injunction, this time basing its reasoning, in part, on the permanent injunction ordered by the district court in the companion *Sierra Club* case.[9]

---

[9] The Supreme Court subsequently granted a stay of the district court's permanent injunction in the separate companion case, *Trump v. Sierra Club*, 140 S. Ct. 1 (2019) (mem.).

The Federal Defendants requested that the district court certify its order as a final judgment for immediate appeal pursuant to Fed. R. Civ. P. 54(b).  In response, the district court considered the appropriate factors, made appropriate findings, and certified the order as final pursuant to Rule 54(b).  *See Pakootas v. Teck Cominco Metals, Ltd.*, 905 F.3d 565, 574 (9th Cir. 2018) (listing factors).  The Federal Defendants timely appealed the district court's judgment, and the States timely cross-appealed the district court's denial of injunctive relief.  The district court's Rule 54(b) certification was proper; therefore, we have jurisdiction under 28 U.S.C. § 1291.  *See Durfey v. E.I. DuPont De Nemours & Co.*, 59 F.3d 121, 124 (9th Cir. 1995) (appeal is proper upon certification as a final judgment pursuant to Rule 54(b)).

We review the existence of Article III standing *de novo*. *See California v. U.S. Dep't of Health & Human Servs.*, 941 F.3d 410, 420 (9th Cir. 2019).  We review questions of statutory interpretation *de novo*.  *See United States v. Kelly*, 874 F.3d 1037, 1046 (9th Cir. 2017).

### III

California and New Mexico have Article III standing to pursue their claims.  In order to establish Article III standing, a plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).[10]  At summary judgment, a plaintiff cannot rest on

---

[10] The Federal Defendants do not challenge California's and New Mexico's Article III standing in these appeals.  However, "the court has an independent obligation to assure that standing exists, regardless of

mere allegations, but "must set forth by affidavit or other evidence specific facts." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412 (2013) (internal quotations and citations omitted). These specific facts, set forth "for purposes of the summary judgment motion[,] will be taken to be true." *Lujan*, 504 U.S. at 561.

States are "entitled to special solicitude in our standing analysis." *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007). As a quasi-sovereign, a state "has an interest independent of and behind the titles of its citizens, in all the earth and air within its domain." *Georgia v. Tenn. Copper Co.*, 206 U.S. 230, 237 (1907). Thus, a state may sue to assert its "quasi-sovereign interests in the health and well-being—both physical and economic—of its residents in general." *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607 (1982). In addition, "[d]istinct from but related to the general well-being of its residents, the State has an interest in securing observance of the terms under which it participates in the federal system." *Id*. at 607–08.

## A

Here, California and New Mexico have alleged that the actions of the Federal Defendants will cause particularized and concrete injuries in fact to the environment and wildlife

---

whether it is challenged by any of the parties." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009).

The Federal Defendants challenged New Mexico's standing before the district court, but conflated its challenge with the APA "zone of interest" requirement, which we will discuss later. The district court held that New Mexico had established Article III standing.

of their respective states as well as to their sovereign interests in enforcing their environmental laws.

1

The El Centro Sector Project 1 involves the Jacumba Wilderness area. California contends that this area is home to a large number of sensitive plant and animal species that are listed as "endangered," "threatened," or "rare" under the federal Endangered Species Act of 1973, 16 U.S.C. § 1531 *et seq.*, or the California Endangered Species Act, Cal. Fish & Game Code § 2050 *et seq.* California alleges that "[t]he construction of border barriers within or near the Jacumba Wilderness Area . . . will have significant adverse effects on environmental resources, including direct and indirect impacts to endangered or threatened wildlife." One such species is the federally and state-endangered peninsular desert bighorn sheep. Another is the flat-tailed horned lizard, a California species of special concern.[11]

---

[11] A species of special concern is "a species, subspecies, or distinct population of an animal native to California that currently satisfies one or more of the following (but not necessarily mutually exclusive) criteria: is extirpated from the State . . .; is listed as Federally-, but not State-, threatened or endangered; meets the State definition of threatened or endangered but has not formally been listed; is experiencing, or formerly experienced, serious (noncyclical) population declines or range retractions (not reversed) that, if continued or resumed, could qualify it for State threatened or endangered status; has naturally small populations exhibiting high susceptibility of to risk from any factor(s), that if realized, could lead to declines that would qualify it for State threatened or endangered status." CAL. DEPT. OF FISH AND WILDLIFE, SPECIES OF SPECIES CONCERN, https://wildlife.ca.gov/Conservation/SSC#394871324-what-is-the-relationship-between-sscs-and-the-california-wildlife-action-plan.

California has adequately set forth facts and other evidence, which taken as true, support these allegations for the purpose of Article III standing. According to the California Department of Fish and Wildlife 2018 annual report addressing sheep monitoring in the Jacumba Wilderness area, "[t]he Jacumba ewe group is dependent on resources both within the US and Mexico. A fence along the US-Mexico border would prohibit movement to, and use of, prelambing and lamb-rearing habitat and summer water sources," and the development of energy projects adjacent to the Jacumba Mountains "combined with disturbance by border security activities" "will have significant adverse impacts on this ewe group." California contends that road construction; grading and construction of equipment storage and parking areas; and off road movement of vehicle and equipment involved in construction will alter the normal behavior of peninsular bighorn sheep, with the most significant effect on the endangered peninsular bighorn sheep being the permanent reduction of its north-south movement across the U.S.-Mexico border. California further avers that the effects of a border wall will place additional pressure on the survival and recovery of the bighorn sheep because the unimpeded movement of the peninsular bighorn sheep between the United States and Mexico is important for increasing and maintaining their genetic diversity. It contends that as the number of animals that move between these two countries declines or ceases, the species will begin to suffer the deleterious effects of inbreeding and reduced genetic diversity.

Likewise, California asserts that the flat-tailed horned lizard lives within the project footprint and surrounding area, and that the extensive trenching, construction of roads, and staging of materials proposed in the area will harm or kill

lizards that are either active or in underground burrows within the project footprint. It claims that the construction of the border wall will also greatly increase the predation rate of lizards adjacent to the wall by providing a perch for birds of prey and will effectively sever the linkage that currently exists between populations on both sides of the border.

New Mexico alleges that "[t]he construction of a border wall in the El Paso Sector along New Mexico's southern border will have adverse effects on the State's environmental resources, including direct and indirect impacts to endangered or threatened wildlife." Such harm "would include the blocking of wildlife migration, flooding, and habitat loss." It notes that the Chihuahuan desert is bisected by the New Mexico-Mexico border, and this "bootheel" region is the most biologically diverse desert in the Western Hemisphere, containing numerous endangered or threatened species. Such species include the Mexican gray wolf and the jaguar, both of which coexist in this region along the U.S.-Mexico border.

New Mexico has adequately set forth facts and other evidence, which taken as true, support these allegations for the purpose of Article III standing. It contends that the construction of El Paso Sector Project 1 may have a number of adverse effects on the Mexican wolf, including injury, death, harm, and harassment due to construction and related activities, as well as abandonment of the area for essential behaviors such as feeding, resting, and mating due to night lighting and the elimination of food sources and habitat in the area. Moreover, New Mexico avers that the construction of El Paso Sector Project 1 would interrupt the movement of the Mexican wolf across the U.S.-Mexico border, putting additional pressure on the species' survival and recovery in the wild because the unimpeded movement of Mexican

wolves between the United States and Mexico is important for increasing and maintaining their genetic diversity. New Mexico notes that the documented movement of a radio-collared Mexican wolf across the border in the areas where border wall construction is planned demonstrates that construction will indeed cause such an interruption.

Additionally, the jaguar is considered endangered by the U.S. Fish and Wildlife Service ("USFWS"). New Mexico avers that jaguars were formerly widespread in the southwest United States, but were extirpated by hunting. It claims that, in recent decades, small numbers of individuals have dispersed north from breeding populations in northern Mexico, with some reaching the mountains in southwestern New Mexico west of Luna County. New Mexico contends that, if further long-term recolonization of jaguars continues, areas in Doña Ana and Luna counties include suitable habitat, but construction of El Paso Sector Project 1 would stop jaguar movement through the region, potentially limiting recolonization.

For these reasons, we conclude that California and New Mexico have each provided sufficient evidence which, if taken as true, would allow a reasonable fact-finder to conclude that both states will suffer injuries in fact to their environmental interests, and in particular, to protected species within their borders.

2

In addition, California and New Mexico have alleged that the Federal Defendants' actions have interfered with their respective abilities to enforce their environmental laws, thus interfering with the terms under which they participate in the

federal system.  They alleged that they have suffered, and will continue to suffer, injuries to their concrete, quasi-sovereign interests relating to the preservation of wildlife resources within their boundaries, including but not limited to wildlife on state properties.

California and New Mexico have adequately set forth facts and other evidence, which taken as true, support these allegations for the purpose of Article III standing.  They have demonstrated that border wall construction injures their quasi-sovereign interests by preventing them from enforcing their environmental laws.

Under California law, the California Water Resources Control Board and nine regional boards establish water quality objectives and standards, and for construction projects like El Centro Sector Project 1, where dredge and fill activities are expected to occur, a regional board must ordinarily certify compliance with water quality standards. The record indicates that, absent the Secretary of Homeland Security's Section 102(c) IIRIRA waiver of the Clean Water Act requirements for the project, El Centro Project 1 could not proceed without completing certification issued by a regional water board because the El Centro Project 1 will occur within or near the Pinto Wash and will traverse at least six ephemeral washes that have been identified as waters of the United States.  The record further indicates that, due to the nature and location of construction, El Centro Project 1 would also require enrollment in the State Water Board's statewide National Pollutant Discharge Elimination General Permit for Storm Water Discharges Associated with Construction and Land Disturbance Activities.

Likewise, the Section 102(c) waiver of the Clean Air Act's requirements undermines California's enforcement of its air quality standards for complying with the Clean Air Act as set forth in California's State Implementation Plan ("SIP"). In particular, but for the waiver, in order to move forward with El Centro Project 1, the Federal Defendants "would be obligated to comply with Rule 801 [of the SIP], which requires the development and implementation of a dust-control plan for construction projects to prevent, reduce, and mitigate [fine particulate matter] emissions."

Moreover, the Section 102(c) waiver exempts the Federal Defendants from complying with laws designed to protect endangered or threatened species. For instance, it exempts the Federal Defendants from consulting with the USFWS to ensure that El Centro Sector Project 1 "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species" that are identified as endangered under California and federal law. 16 U.S.C. § 1536(a)(2). As we have noted, California contends that the El Centro Sector Project 1 is likely to harm federal and California endangered species such as the peninsular bighorn sheep and the flat-tailed horned lizard. The presence of these species led the USFWS, Bureau of Land Management ("BLM"), California Department of Fish and Wildlife, and California State Parks to develop and implement the "Flat-Tailed Horned Lizard Rangewide Management Strategy," which imposes restrictions on projects resulting in large-scale soil disturbances in the project area and prohibits activities that restrict the lizards' interchange with lizard populations across the border. Without the Section 102(c) waiver, this management strategy would impose certain restrictions and mitigation measures on the border wall construction projects.

Under New Mexico law, the Federal Defendants, absent the Section 102(c) waiver of the Clean Air Act's requirements, would normally be required to comply with New Mexico's fugitive dust control rule and High Wind Fugitive Dust Mitigation Plan that New Mexico adopted under the Clean Air Act. *See* N.M. Admin. Code §§ 20.2.23.109–.112 (mandating that "[n]o person . . . shall cause or allow visible emissions from fugitive dust sources that: pose a threat to public health; interfere with public welfare, including animal or plant injury or damage, visibility or the reasonable use of property" and "[e]very person subject to this part shall utilize one or more control measures . . . as necessary to meet the requirements of [this section]"). The waiver, however, prevents New Mexico from enforcing these air quality rules.

New Mexico further contends that, absent the Section 102(c) waiver, the Federal Defendants would also normally be required to consult with the USFWS to protect species such as the Mexican wolf that are endangered under both federal and New Mexico Law. Moreover, the USFWS's management plan for the species—the "Mexican Wolf Recovery Plan-First Revision"—which is designed to "facilitate the wolf's revival," "calls for a minimum of 320 wolves in the United States and 200 in Mexico to meet recovery goals." The "binational recovery strategy" of this plan was developed by the USFWS "in coordination with federal agencies in Mexico and state, federal, and Tribal agencies in the United States," and "[e]ffective recovery requires participation by multiple parties within Federal, state, and local governments." USFWS, MEXICAN WOLF RECOVERY PLAN-FIRST REVISION at 10, 16 (2017). Construction undermines this plan because it inhibits the

"utilization of habitat" and does not promote "meta-population connectivity."

The Section 102(c) waiver likewise prevents New Mexico from enforcing its Wildlife Corridors Act. Portions of El Paso Project 1 cross New Mexico State Trust Lands, and New Mexico contends that the planned pedestrian fencing disrupts habitat corridors in New Mexico—contravening to the Wildlife Corridors Act. The Act "requires New Mexico state agencies to create a 'wildlife corridors action plan' to protect species' habitat." New Mexico further avers that New Mexico's State Trust Lands in and around the El Paso Project 1 site form an important wildlife corridor for numerous species such as mule deer, javelina, pronghorn, bighorn sheep, mountain lion, bobcat, coyote, bats, quail, and other small game like rabbits.

In sum, we conclude that California and New Mexico have each provided sufficient evidence which, if taken as true, would allow a reasonable fact-finder to conclude that they have both suffered injuries in fact to their sovereign interests.

B

Turning to the causation requirement, we conclude that California has alleged environmental and sovereign injuries "fairly traceable" to the Federal Defendants' conduct. To satisfy this requirement, California and New Mexico "need not show that [Section 8005 is] 'the very last step in the chain of causation.'" *Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*, 733 F.3d 939, 953 (9th Cir. 2013) (quoting *Bennett v. Spear*, 520 U.S. 154, 169 (1997)). "A causal chain does not fail simply because it has several

'links,' provided those links are 'not hypothetical or tenuous' and remain 'plausib[le].'" *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011) (quoting *Nat'l Audubon Soc., Inc. v. Davis*, 307 F.3d 835, 849 (9th Cir. 2002)).

With respect to most of the environmental injuries, causation is apparent—for instance, as explained above, the construction and presence of the border wall will separate the peninsular bighorn sheep and Mexican wolf populations, decreasing biodiversity, and harming these species.

Although slightly more attenuated, we also conclude that the causation requirement is likewise satisfied for the injuries to California's and New Mexico's quasi-sovereign interests. It makes no difference that the Section 102(c) waiver is most directly responsible for these injuries because without Section 8005, there is no waiver. That is, without the Section 8005 funding to construct El Centro Sector Project 1 and El Paso Sector Project 1, there would be no basis to invoke Section 102(c), and therefore, no resulting harm to California's and New Mexico's sovereign interests. Thus, we conclude that these injuries too are fairly traceable to the Section 8005 transfers of funds.

## C

A ruling in California and New Mexico's favor would redress their harms. Without the Section 8005 funds, DoD had inadequate funding to finance construction of these projects; presumably, without this funding, construction of El Centro Sector Project 1 and El Paso Sector Project 1 would cease. This would prevent both the environmental injuries and the sovereign injuries alleged.

Thus, these facts would allow a reasonable fact-finder to conclude that, if funds are diverted to construct border wall projects in the El Centro and El Paso Sectors, California and New Mexico will each suffer environmental and quasi-sovereign injuries in fact that are fairly traceable to the challenged conduct of the Federal Defendants and likely to be redressed by a favorable judicial decision.  California and New Mexico have established the requisite Article III standing to challenge the Federal Defendants' actions.

IV

The Federal Defendants argue that California and New Mexico lack the right to challenge the transfer of funds under the APA.  We disagree.[12]

The APA provides for judicial review of "final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.  Where a statute imposes obligations on a federal agency but the obligations do not "give rise to a 'private' right of action against the federal government[,] [a]n aggrieved party may pursue its remedy under the APA."  *San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1099 (9th Cir. 2005).  California and New Mexico must, however, establish that they fall within the zone of interests of the relevant statute to bring an APA claim.  *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,

---

[12] The States argue that they have both an equitable *ultra vires* cause of action and a cause of action under the APA.  Although each of the claims can proceed separately, *see Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1170 (9th Cir. 2017), we do not need to address the *ultra vires* claims here.  The States seek the same scope of relief under both causes of action and they prevail under the APA.

567 U.S. 209, 224 (2012) ("This Court has long held that a person suing under the APA must satisfy not only Article III's standing requirements, but an additional test: The interest he asserts must be 'arguably within the zone of interests to be protected or regulated by the statute' that he says was violated." (quoting *Ass'n of Data Processing Serv. Org., Inc. v. Camp*, 397 U.S. 150, 153 (1970))).

Section 8005 does not confer a private right of action. Instead, it delegates a narrow slice of Congress's appropriation power to DoD to allow the agency to respond flexibly to unforeseen circumstances implicating the national interest. In doing so, the statute imposes certain obligations upon DoD—*i.e.*, DoD cannot invoke Section 8005 unless there is an unforeseen military requirement and unless Congress did not previously deny the item requested. California and New Mexico argue that DoD did not satisfy these obligations. We agree. Therefore, as aggrieved parties, California and New Mexico may pursue a remedy under the APA, so long as they fall within Section 8005's zone of interests.

As a threshold matter, Section 8005 is the relevant statute for the zone of interests test. "Whether a plaintiff's interest is 'arguably . . . protected . . . by the statute' within the meaning of the zone-of-interests test is to be determined *not by reference to the overall purpose of the Act* in question . . . but by reference to the *particular provision of law* upon which the plaintiff relies." *Bennett*, 520 U.S. at 175–76 (emphasis added). Here, for purposes of their APA claim, California and New Mexico rely on Section 8005's limitations. Thus, Section 8005 is the relevant statute for the zone of interests test.

The Supreme Court has clarified that, in the APA context, the zone of interests test does "not require any 'indication of congressional purpose to benefit the would-be plaintiff.'" *Patchak*, 567 U.S. at 225 (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399–400 (1987)). It has repeatedly emphasized that the zone of interests test is "not 'especially demanding'" in the APA context. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014) (quoting *Patchak*, 567 U.S. at 225). Instead, for APA challenges, a plaintiff can satisfy the test in either one of two ways: (1) "if it is among those [who] Congress expressly or directly indicated were the intended beneficiaries of a statute," or (2) "if it is a suitable challenger to enforce the statute—that is, if its interests are sufficiently congruent with those of the intended beneficiaries that the litigants are not more likely to frustrate than to further . . . statutory objectives." *Scheduled Airlines Traffic Offices, Inc. v. Dep't of Def.*, 87 F.3d 1356, 1359 (D.C. Cir. 1996) (alterations in original) (quotations and citations omitted). "The test forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Patchak*, 567 U.S. at 225 (quoting *Clarke*, 479 U.S. at 399). "We apply the test in keeping with Congress's 'evident intent' . . . 'to make agency action presumptively reviewable[,]'" and note that "the benefit of any doubt goes to the plaintiff." *Id.* (quoting *Clarke*, 479 U.S. at 399).

In enacting Section 8005, Congress primarily intended to benefit itself and its constitutional power to manage appropriations. The obligations imposed by the section limit the scope of the authority delegated to DoD, reserving to Congress in most instances the power to appropriate funds to

particular DoD accounts for specific purposes.   This conclusion is reinforced by the legislative history.  Congress first imposed limits on DoD's transfer authority in order to "tighten congressional control of the reprogramming process."  H.R. Rep. No. 93-662, at 16 (1973).

The field of suitable challengers must be construed broadly in this context because, although Section 8005's obligations were intended to protect Congress, restrictions on congressional standing make it difficult for Congress to enforce these obligations itself.  *See Goldwater v. Carter*, 617 F.2d 697, 702 (D.C. Cir. 1979), *vacated and remanded on other grounds*, 44 U.S. 996 (1979) (explaining that a member of Congress has standing only if "the alleged diminution in congressional influence . . . amount[s] to a disenfranchisement, a complete nullification or withdrawal of a voting opportunity").  Indeed, the House of Representatives filed its own lawsuit in the U.S. District Court for the District of Columbia challenging this same transfer of funds, but the court held that the House lacked standing to sue.  *See U.S. House of Reps. v. Mnuchin*, 379 F. Supp. 3d 8, 11 (D.D.C. 2019) ("And while the Constitution bestows upon Members of the House many powers, it does not grant them standing to hale the Executive Branch into court claiming a dilution of Congress's legislative authority.").

California and New Mexico are suitable challengers because their interests are congruent with those of Congress and are not "inconsistent with the purposes implicit in the statute."  *Patchak*, 567 U.S. at 225.  First, this challenge actively furthers Congress's intent to "tighten congressional control of the reprogramming process."  H.R. Rep. No. 93-662, at 16 (1973).  In particular, this challenge furthers this intent because, even though Section 8005 does not require

formal congressional approval to reprogram funds, the congressional committees expressly disapproved of DoD's use of the authority here.

Second, California and New Mexico's challenge strives to reinforce the same structural constitutional principle Congress sought to protect through Section 8005: congressional power over appropriations. *See* U.S. Const. art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . . ."); *see also Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (explaining that this "straightforward and explicit command" "'means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress'" (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937))). California and New Mexico's interest in reinforcing these structural separation of powers principles is unique but aligned with that of Congress because just as those principles are intended "to protect each branch of [the federal] government from incursion by the others," the "allocation of powers in our federal system [also] preserves the integrity, dignity, and residual sovereignty of the States," because "[f]ederalism has more than one dynamic." *Bond v. United States*, 564 U.S. 211, 221–22 (2011). This interest applies with particular force here because the use of Section 8005 here impacts California's and New Mexico's ability to enforce their state environmental laws. *See Massachusetts v. EPA*, 549 U.S. at 518–19 ("'[T]he State has an interest independent of and behind the titles of its citizens, in all the earth and air within its domain. It has the last word as to whether its mountains shall be stripped of their forests and its inhabitants shall breathe pure air.'" (quoting *Tenn. Copper Co.*, 206 U.S. at 237)); *see also Maine v. Taylor*, 477 U.S. 131, 151 (1986) ("[A state] retains broad regulatory authority

to protect the health and safety of its citizens and the integrity of its natural resources."). Here, the use of Section 8005 allows the government to invoke Section 102(c) of IIRIRA to waive state environmental law requirements for purposes of building the border wall.[13] Thus, Section 8005's limitations protect California's and New Mexico's sovereign interests, just as they protect Congress's constitutional interests, because they ensure that, ordinarily, Executive action cannot override these interests without congressional approval and funding. Therefore, just as Section 8005's limitations serve Congress to preserve the "equilibrium the Constitution sought to establish—so that 'a gradual concentration of the several powers in the same department,' can effectively be resisted," they likewise serve California and New Mexico as well. *Morrison v. Olson*, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting) (quoting Federalist No. 51, p. 321 (J. Madison)).

Moreover, that the states regularly benefit from DoD's use of Section 8005 reinforces that California and New Mexico's interests are *not* "so marginally related" that "it can[] reasonably be assumed that Congress intended to permit suit." *Patchak*, 567 U.S. at 225. For instance, in 2004 DoD invoked Section 8005 to transfer funds to pay for storm damages incurred by airforce bases across Florida during Hurricane Charley. Office of the Under Sec'y of Def. (Comptroller), FY 04-37 PA, Reprogramming Action (2004). Likewise, in 2008 DoD invoked Section 8005 to finance costs incurred by the National Guard in responding to Hurricane

---

[13] As we explained with respect to Article III standing, California and New Mexico have provided sufficient evidence by declaration to establish that they have suffered cognizable injuries to their sovereign interests and that this injury is fairly traceable to the Federal Defendants' use of Section 8005.

Gustav in Louisiana, Texas, Mississippi, and Alabama, as well as operations related to Hurricane Ike in Texas and Louisiana. Office of the Under Sec'y of Def. (Comptroller), FY 08-43 PA, Reprogramming Action (2008). The historical use of Section 8005 supports that states are "reasonable" and "predictable" challengers to its use, and this instance is no anomaly. *Patchak*, 567 U.S. at 227.

For these reasons, California and New Mexico easily fall within the zone of interests of Section 8005 and are suitable challengers to enforce its obligations. We therefore affirm the grant of summary judgment to the States. To conclude otherwise would effectively hold that no entity could fall within Section 8005's zone of interests, and that no agency action taken pursuant to Section 8005 could ever be challenged under the APA. Such a conclusion is not tenable, and a result Congress surely did not intend.

V

The district court correctly held that Section 8005 did not authorize DoD's budgetary transfer to fund construction of the El Paso and El Centro Sectors.

In construing a statute, we begin, as always, with the language of the statute. *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1026 (9th Cir. 2013). "When terms are not defined within a statute, they are accorded their plain and ordinary meaning, which can be deduced through reference sources such as general usage dictionaries." *Id.* Of course, "[s]tatutory language must always be read in its proper context," *id.* (quotations and citation omitted), as courts must look to the "design of the statute as a whole and to its object and policy," *id.* (quotations

and citation omitted), and "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme," *Home Depot U.S.A., Inc. v. Jackson*, 139 S. Ct. 1743, 1748 (2019) (quotations and citation omitted).

Section 8005's transfer authority cannot be invoked "unless for higher priority items, based on unforeseen military requirements, than those for which originally appropriated and in no case where the item for which funds are requested has been denied by the Congress." Two limitations are important to our analysis: (1) that the transfer must be "based on unforeseen military requirements," and (2) that the transfer authority cannot be invoked if the "item for which funds are requested ha[d] been denied by the Congress." We conclude that the district court correctly determined that the border wall was not an unforeseen military requirement, that funding for the wall had been denied by Congress, and therefore, that the transfer authority granted by Section 8005 was not permissibly invoked.

## A

Section 8005 authorizes the transfer of funds only in response to an "unforeseen military requirement." The district court properly concluded that the need for a border wall was not unforeseen. We also conclude that the need was unrelated to a military requirement.

### 1

Section 8005 does not define "unforeseen." Therefore, we start by considering the ordinary meaning of the word. Something is unforeseen when it is "not anticipated or

expected." *Unforeseen*, MERRIAM-WEBSTER ONLINE DICTIONARY (2020). By contrast, to foresee is "to see (something, such as a development) *beforehand*." *Foresee*, MERRIAM-WEBSTER ONLINE DICTIONARY (2020) (emphasis added). Prior use of this authority confirms this meaning. Previously, DoD has invoked its Section 8005 authority to transfer funds to repair hurricane and typhoon damage to military bases—natural disasters that inflict damage that may not be anticipated or expected ahead of time. We conclude that an unforeseen requirement is one that DoD did not anticipate or expect.

Neither the problem, nor the President's purported solution, was unanticipated or unexpected here. The smuggling of drugs into the United States at the southern border is a longstanding problem. U.S. CUSTOMS AND BORDER PATROL, BORDER PATROL HISTORY, https://www.cbp.gov/border-security/along-us-borders/history (last visited June 16, 2020) ("By [the early 1960's] the business of alien smuggling began to involve drug smuggling also. The Border Patrol assisted other agencies in intercepting illegal drugs from Mexico."); *United States v. Flores-Montano*, 541 U.S. 149, 153 (2004) ("That interest in protecting the borders is illustrated in this case by the evidence that smugglers frequently attempt to penetrate our borders with contraband secreted in their automobiles' fuel tank. Over the past 5 1/2 fiscal years, there have been 18,788 vehicle drug seizures at the southern California ports of entry."). Indeed, the federal Drug Enforcement Administration was created over four decades ago in 1974 in large part to address the smuggling of illegal drugs into the United States. *See* Reorganization Plan No. 2 of 1973, 87 Stat. 1091, as amended Pub. L. 93-253, §1, 88 Stat. 50 (1974).

Congress's joint resolution terminating the President's declaration of a national emergency only reinforces this point: there was no unanticipated crisis at the border. Nothing prevented Congress from funding solutions to this problem through the ordinary appropriations process— Congress simply chose not to fund this particular solution.

The long, well-documented history of the President's efforts to build a border wall demonstrates that he considered the wall to be a priority from the earliest days of his campaign in 2015. *See, e.g.*, *Here's Donald Trump's Presidential Announcement Speech*, TIME (June 16, 2015) ("I would build a great wall . . . I will build a great, great wall on our southern border."); *Transcript of Donald Trump's Immigration Speech*, NEW YORK TIMES (Sept. 1, 2016) ("On day one, we will begin working on an impenetrable, physical, tall, power, beautiful southern border wall."). Moreover, his repeated pronouncements on the subject made clear that federal agencies like DoD might be tasked with the wall's funding and construction. Congress's repeated denials of funding only drew national attention to the issue and put agencies on notice that they might be asked to finance construction. *See* Securing America's Future Act of 2018, H.R. 4760, 115th Cong. § 1111 (2018); Border Security and Immigration Reform Act of 2018, H.R. 6136, 115th Cong. § 5101 (2018); American Border Act, H.R. 6415, 115th Cong. § 4101 (2018); Fund and Complete the Border Wall Act, H.R. 6657, 115th Cong. § 2 (2018); Build the Wall, Enforce the Law Act of 2018, H.R. 7059, 115th Cong. § 9 (2018); 50 Votes for the Wall Act, H.R. 7073, 115th Cong. § 2 (2018); WALL Act of 2018, S. 3713, 115th Cong. § 2 (2018). In short, neither the conditions at the border nor the President's position that a wall was needed to address those conditions was unanticipated or unexpected by DoD.

The Federal Defendants' arguments to the contrary are unpersuasive. They assert that "an agency's *request*" "will be foreseen" only "when *it is received* by DoD in time to include in the submission to Congress [for the yearly budget]," and that therefore, the transfer at issue here complied with the text of the statute. (emphasis added). There are two problems with the Federal Defendants' position.

First, Section 8005 permits transfers based only on unforeseen military *requirements*—not unforeseen budgetary *requests*. A requirement that gives rise to a funding request is distinct from the request itself. Here, the requirement that gave rise to the Section 284 requests is a border wall. Thus, to invoke the statute, the need for a border wall must have been unforeseen. To hold otherwise—*i.e.*, to conclude that transfers are permitted under Section 8005 if they are based on unforeseen budgetary requests—would undermine the narrowness of the statute and potentially encourage DoD and other agencies to submit budgetary requests after DoD has submitted its final budget to Congress in order to skirt the congressional appropriations process. This result is inconsistent with the purpose of Section 8005: to "tighten congressional control of the reprogramming process." H.R. Rep. No. 93-662, at 16 (1973). If this interpretation prevailed, the exception would swallow the rule and undermine Congress's constitutional appropriations power.

Second, even if we were to accept the government's definition of "requirement" as equivalent to "request," DHS's specific Section 284 requests were both anticipated and expected, even within the confines of the appropriations context. Nearly six months before the enactment of the 2019 DoD Appropriations Act, the President wrote the following in a memorandum to the Secretary of Defense, the Attorney

General, and the Secretary of Homeland Security: "The Secretary of Defense shall support the Department of Homeland Security in securing the southern border and taking other necessary actions to stop the flow of deadly drugs and other contraband . . . into this country."  Further, in a response to a request for information from the House Armed Services Committee, DoD wrote that the "DoD Comptroller with[held] over 84% ($947 million) of [counter-drug] appropriated funds for distribution until the 4th Quarter for possible use in supporting Southwest Border construction last fiscal year."  As explained by the Staff Director of the House Armed Services Committee, this "suggests that DoD was considering using its counter-drug authority under 10 U.S.C. § 284 for southern border construction in early 2018." Further still, because Section 284 only allows DoD to provide support that is *requested* by other agencies, DoD's retention of funds suggests it likely anticipated such a request.  *See* 10 U.S.C. § 284(a)(1) ("The Secretary of Defense may provide support . . . if . . . such support is requested.").

The Federal Defendants also unpersuasively equate "foreseen" with "known."  "[T]o know" means "to perceive directly: have direct cognition of."  *Know*, MERRIAM-WEBSTER ONLINE DICTIONARY (2020).  This interpretation effectively eliminates any element of anticipation or expectation.  "'Congress' choice of words is presumed to be deliberate' and deserving of judicial respect." *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1355 (2018) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013)).  Thus, we must presume that Congress's use of the word "unforeseen" is deliberate.  Congress could have easily specified that a transfer is permitted only when based on "unknown" requirements, but it did not.  Instead, Congress specified that Section 8005 permits a transfer only where a

requirement was unforeseen—*i.e.*, unanticipated or unexpected. We decline to read into the text a lower standard based on actual knowledge.[14]

In sum, both the requirement to build a wall on the southern border as well as the DHS request to DoD to build that wall were anticipated and expected. Thus, neither was "unforeseen" within the meaning of Section 8005.

2

Section 8005 not only mandates that the requirement be unforeseen, but also that it be a *military requirement*. Under relevant definitions, the construction of El Centro and El Paso projects does not satisfy any definition of a "military requirement."

The 2019 Appropriations Act does not define "military." Therefore, we start by considering its ordinary meaning: "of or relating to soldiers, arms, or war." *Military*, MERRIAM-WEBSTER ONLINE DICTIONARY (2020). The border wall construction projects here plainly fail to satisfy this definition because the Federal Defendants have argued neither that the border wall construction projects are related to the use of soldiers or arms, nor that there is a war on the southern border.

---

[14] Indeed, in DoD parlance, the possibility that border funding from the DoD budget might be requested was a "known unknown," as opposed to "unforeseeable," which would be an "unknown unknown," a category which former Secretary of Defense Rumsfeld described as including a "genuine surprise." DONALD RUMSFELD, KNOWN AND UNKNOWN: A MEMOIR, p. xiv. (2011).

The administrative record underscores this point, and supports that the border wall construction projects are not military ones. The record demonstrates that the diverted funding is primarily intended to support DHS—a civilian agency entirely separate from any branch of the armed forces. The Assistant Secretary of Defense stated that the funds were transferred "to provide assistance to DHS to construct fencing to block drug-smuggling corridors in three project areas along the southern border of the United States." He also explained that the purpose of the transfer was to "support DHS's efforts to secure the southern border." By contrast, the transfer of funds for border wall construction does little to assist DoD with any of its operations. Even to the extent it might, it does so only insofar as it helps DoD assist DHS: as summarized by the Chairman of the Joint Chiefs of Staff and DHS, border wall projects "allow DoD *to provide support to DHS* more efficiently and effectively." (emphasis added). In short, the fact that construction is intended to support a civilian agency, as opposed to DoD itself or any branch of the armed forces, emphasizes that the transfer fails to meet the plain meaning of "military."

The border wall construction projects do not even satisfy a statutory definition specifically invoked by the Federal Defendants. *See also* WILLIAM N. ESKRIDGE ET AL., LEGISLATION AND STATUTORY INTERPRETATION 273 (2d ed. 2006) ("A word or clause that is ambiguous at first glance might be clarified if 'the same terminology is used elsewhere in a context that makes its meaning clear'" and such coherence arguments may be invoked "across as well as within statutes" (quoting *United Savings Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988))).

The Federal Defendants have also invoked 10 U.S.C. § 2808 ("Section 2808") to fund other border wall construction projects on the southern border. Section 2808 incorporates the definition of "military construction" provided by 10 U.S.C. § 2801(a): it defines "military construction" as construction associated with a "military installation" or "defense access road." Section 2801(c)(4) further defines "military installation" as "a base, camp, post, station, yard, center, or other activity under the jurisdiction of the Secretary of a military department."[15]

The border wall construction projects at issue in this appeal are not carried out with respect to a "military installation." The projects themselves are not a base, camp, station, yard, or center, and unlike the projects considered by the Federal Defendants' related Section 2808 appeal, the

---

[15] To be sure, Section 8005 states that it applies only to transfers between appropriations for "military functions," as opposed to the phrase "military construction" used in Section 2808. However, the statutes address similar subject matter, and it is of some significance that the Federal Defendants have invoked Section 2808 for functionally identical projects, claiming that such projects constitute "military construction" within the meaning of that statute, while also asserting that such projects satisfy the term "military" within the meaning of Section 8005. And, as we know, "'statutes addressing the same subject matter' should be construed *in pari materia*." *Fed. Trade Comm'n v. AMG Capital Mgmt., LLC*, 910 F.3d 417, 433 n.2 (9th Cir. 2018) (O'Scannlain, J., concurring) (quoting *Wachovia Bank v. Schmidt*, 546 U.S. 303, 315 (2006)). Under that doctrine, related statutes should "be construed as if they were one law." *Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972) (quotations and citation omitted). Further, even apart from *in pari materia* considerations, the Supreme Court "has previously compared nonanalogous statutes to aid its interpretation of them." *Nat'l Fed'n of Fed. Emps., Local 1309 v. Dep't of Interior*, 526 U.S. 86, 105 (1999) (O'Connor, J., dissenting) (citing *Overstreet v. North Shore Corp.*, 318 U.S. 125, 131–32 (1943)).

projects at issue in this appeal have not been brought under military jurisdiction. Moreover, there are no military installations in the El Centro or El Paso project areas, nor any claim of a requirement for a defense access road; instead, as we have noted, the projects affect open wilderness areas—the El Centro Sector project involves the Jacumba Wilderness areas, and the El Paso Sector project involves the Chihuahuan desert. The fact that the construction projects fail to meet Section 2808's definition of military construction supports that these projects fail to satisfy any meaningful definition of "military."

Even if we were to afford some consideration to the subchapter title for Section 284 authorizing "Military Support for Civilian Law Enforcement Agencies," there is a distinction to be drawn between "military support," and what the statute requires: a "military requirement." Requirement ordinarily means "something wanted or needed," or "something essential to the existence or occurrence of something else." *Requirement*, MERRIAM-WEBSTER ONLINE DICTIONARY (2020). The border wall construction projects are not something needed or essential to the armed forces, soldiers, arms, or any sort of war effort. Rather, as explained above, they are designed to "provide assistance" and "support" to DHS, a civilian agency. While providing such support may be appropriate under Section 284, a request for this support without connection to any military function fails to rise to the level of a military requirement for purposes of Section 8005. Simply because a civilian agency requests support in furtherance of a particular objective, even when such support is authorized by statute, does not mean that the military itself *requires* that objective.

To conclude that supporting projects unconnected to any military purpose or installation satisfies the meaning of "military requirement" would effectively write the term out of Section 8005. Therefore, we conclude that the transfers at issue here do not satisfy Section 8005's military purpose requirement.

B

In addition, Section 8005 authorizes the transfer of funds only when "the item for which funds are requested has [not] been denied by the Congress." The question here is whether by declining to provide sufficient funding for the border wall, Congress denied the item for which funds were requested within the meaning of the statute.

As we have explained, Congress declined to fund the border wall numerous times in a variety of ways. Congress failed to pass seven different bills, *see supra at* 37–38, that were proposed specifically to fund the wall. Congress also refused to appropriate the $5.7 billion requested by the White House in the CAA; instead, Congress appropriated $1.375 billion, less than a quarter of the funds requested, for "the construction of primary pedestrian fencing . . . in the Rio Grande Valley Sector." CAA at § 230(a)(1).

The Federal Defendants assert that the Section 8005 transfer would be invalid only if Congress had denied a Section 284 budgetary line item request to fund the border wall. But "[i]n common usage, a general denial of something requested can, and in this case does, encompass more specific or narrower forms of that request." *Sierra Club v. Trump*, 929 F.3d 670, 691 (9th Cir. 2019). Here, Congress refused to provide the funding requested by the President for border

wall construction: a general denial. This general denial necessarily encompasses narrower forms of denial—such as the denial of a Section 284 budgetary line item request. We decline to impose upon Congress an obligation to deny every possible source of funding when it refuses to fund a particular project—surely when Congress withheld additional funding for the border wall, it intended to withhold additional funding for the wall, regardless of its source. "No" means no.

To hold that Congress did not previously deny the Executive Branch's request for funding to construct a border wall would be to "find secreted in the interstices of legislation the very grant of power which Congress consciously withheld." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 609 (1952) (Frankfurter, J., concurring). Regardless of how specific a denial may be in some circumstances, Congress's broad and resounding denial resulting in a 35-day partial government shutdown must constitute a previous denial for purposes of Section 8005. This history precludes the use of Section 8005's transfer authority.

C

In sum, Section 8005 did not authorize the transfer of funds challenged by California and New Mexico. Absent such statutory authority, the Executive Branch lacked independent constitutional authority to transfer the funds at issue here. *See City and Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1233–34 (9th Cir. 2018) ("[W]hen it comes to spending, the President has none of 'his own constitutional powers' to 'rely' upon." (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring))). Therefore, the transfer of

funds at issue here was unlawful. We affirm the district court's declaratory judgment to California and New Mexico.

## VI

Finally, we consider the district court's denial of California and New Mexico's request for injunctive relief, a decision we review for an abuse of discretion. *See Midgett v. Tri-Cty. Metro. Transp. Dist. of Or.*, 254 F.3d 846, 849 (9th Cir. 2001). The district court denied the States' request for a permanent injunction primarily because the relief sought was duplicative of the relief the district court had already granted in the *Sierra Club* matter. That decision, which is the only one before us in this appeal, was certainly not an abuse of discretion. As we have noted, however, subsequent to the district court's decision, the Supreme Court stayed the *Sierra Club* permanent injunction. *See Sierra Club*, 140 S. Ct. at 1.

Nevertheless, given the totality of the considerations at issue in this case, we continue to see no abuse of discretion in the district court's order, even though at this moment, the injunction in *Sierra Club* no longer affords the States protection. We emphasize, however, that depending on further developments in these cases, the States are free to seek further remedies in the district court or this Court.

## VII

In sum, we affirm the district court. We conclude that California and New Mexico have Article III standing to file their claims, that California and New Mexico are sufficiently within Section 8005's zone of interests to assert an APA claim, and that the Federal Defendants violated Section 8005 in transferring DoD appropriations to fund the El Centro and

El Paso Sectors of the proposed border wall. We also decline to reverse the district court's decision against imposing a permanent injunction, without prejudice to renewal. Given our resolution of this case founded upon the violations of Section 8005, we need not—and do not—reach the merits of any other theory asserted by the States, nor reach any other issues presented by the parties.

**AFFIRMED.**

COLLINS, Circuit Judge, dissenting:

In the judgment under review, the district court granted summary judgment and declaratory relief to California and New Mexico on their claims challenging the Acting Secretary of Defense's invocation of § 8005 and § 9002 of the Department of Defense Appropriations Act, 2019 ("DoD Appropriations Act"), Pub. L. No. 115-245, Div. A, 132 Stat. 2981, 2999, 3042 (2018), to transfer $2.5 billion in funds that Congress had appropriated for other purposes into a different Department of Defense ("DoD") appropriation that could then be used by DoD for construction of border fencing and accompanying roads and lighting. The States allege that the transfers were not authorized under § 8005 and § 9002 and that, as a result of the construction activities made possible by the unlawful transfers, the States have suffered injuries to their sovereign and environmental interests. The majority concludes that the States have Article III standing; that they have a cause of action to challenge the transfers under the Administrative Procedure Act ("APA"); that the transfers were unlawful; and that the district court properly determined that the States are not entitled to any relief beyond a

declaratory judgment.  I agree that at least California has established Article III standing, but in my view the States lack any cause of action to challenge the transfers, under the APA or otherwise.  And even assuming that they had a cause of action, I conclude that the transfers were lawful. Accordingly, I would reverse the district court's partial judgment for the States and remand for entry of partial summary judgment in favor of the Defendants.  I respectfully dissent.

# I

The parties' dispute over DoD's funding transfers comes to us against the backdrop of a complex statutory framework and an equally complicated procedural history.  Before turning to the merits, I will briefly review both that framework and that history.

# A

Upon request from another federal department, the Secretary of Defense is authorized to "provide support for the counterdrug activities" of that department by undertaking the "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States."  10 U.S.C. § 284(a), (b)(7).  On February 25, 2019, the Department of Homeland Security ("DHS") made a formal request to DoD for such assistance.  Noting that its counterdrug activities included the construction of border infrastructure, *see* Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, Div. C, § 102(a), 110 Stat. 3009-546, 3009-554 (1996) (codified as amended as a note to 8 U.S.C. § 1103), DHS requested that "DoD,

pursuant to its authority under 10 U.S.C. § 284(b)(7), assist with the construction of fences[,] roads, and lighting" in several specified "Project Areas" in order "to block drug-smuggling corridors across the international boundary between the United States and Mexico."

On March 25, 2019, the Acting Defense Secretary invoked § 284 and approved the provision of support for, *inter alia*, DHS's "El Paso Sector Project 1," which would involve DoD construction of border fencing, roads, and lighting in Luna and Doña Ana Counties in New Mexico. Thereafter, the Secretary of Homeland Security invoked his authority under § 102(c) of IIRIRA to waive a variety of federal environmental statutes with respect to the planned construction of border infrastructure in the El Paso Sector, as well as "all . . . state . . . laws, regulations, and legal requirements of, deriving from, or related to the subject of," those federal laws. *See* 84 Fed. Reg. 17185, 17187 (Apr. 24, 2019).

Subsequently, on May 9, 2019, the Acting Defense Secretary again invoked § 284, this time to approve DoD's construction of similar border infrastructure to support, *inter alia*, DHS's "El Centro Sector Project 1" in Imperial County, California. Less than a week later, the Secretary of Homeland Security again invoked his authority under IIRIRA § 102(c) to waive federal and state environmental laws, this time with respect to the construction in the relevant section of the El Centro Sector. *See* 84 Fed. Reg. 21800, 21801 (May 15, 2019).

Although § 284 authorized the Acting Defense Secretary to provide this support, there were insufficient funds in the relevant DoD appropriation to do so. Specifically, for Fiscal

Year 2019, Congress had appropriated for "Drug Interdiction and Counter-Drug Activities, Defense" a total of only $670,271,000 that could be used for counter-drug support. *See* DoD Appropriations Act, Title VI, 132 Stat. at 2997 (appropriating, under Title governing "Other Department of Defense Programs," a total of "$881,525,000, of which $517,171,000 shall be for counter-narcotics support"); *id.*, Title IX, 132 Stat. at 3042 (appropriating $153,100,000 under the Title governing "Overseas Contingency Operations"). Accordingly, to support the El Paso Sector Project 1, the Acting Secretary on March 25, 2019 invoked his authority to transfer appropriations under § 8005 of the DoD Appropriations Act and ordered the transfer of $1 billion from "excess Army military personnel funds" into the "Drug Interdiction and Counter-Drug Activities, Defense" appropriation. That transfer was accomplished by moving $993,627,000 from the "Military Personnel, Army" appropriation and $6,373,000 from the "Reserve Personnel, Army" appropriation.

To support the El Centro Sector Project 1, the Acting Secretary on May 9, 2019 again invoked his transfer authority to move an additional $1.5 billion into the "Drug Interdiction and Counter-Drug Activities, Defense" appropriation. Pursuant to § 8005 of the DoD Appropriations Act, DoD transferred a total of $818,465,000 from 12 different DoD appropriations into the "Drug Interdiction and Counter-Drug Activities, Defense" appropriation. Invoking the Secretary's distinct but comparable authority under § 9002 to transfer funds appropriated under the separate Title governing "Overseas Contingency Operations," DoD transferred $604,000,000 from the "Afghanistan Security Forces Fund" appropriation and $77,535,000 from the "Operation and Maintenance, Defense-Wide" appropriation into the "Drug

Interdiction and Counter-Drug Activities, Defense" appropriation.

## B

The complex procedural context of this case involves two parallel lawsuits and four appeals to this court, and it has already produced one published Ninth Circuit opinion that was promptly displaced by the Supreme Court.

## 1

California and New Mexico, joined by several other States, filed this action in the district court against the Acting Defense Secretary, DoD, and a variety of other federal officers and agencies. In their March 13, 2019 First Amended Complaint, they sought to challenge, *inter alia*, any transfer of funds by the Acting Secretary under § 8005 or § 9002. The Sierra Club and the Southern Border Communities Coalition ("SBCC") filed a similar action, and their March 18, 2019 First Amended Complaint also sought to challenge any such transfers. Both sets of plaintiffs moved for preliminary injunctions in early April 2019. The portion of the States' motion that was directed at the § 8005 transfers was asserted only on behalf of New Mexico and only with respect to the construction on New Mexico's border (*i.e.*, El Paso Sector Project 1). The Sierra Club motion was likewise directed at El Paso Sector Project 1, but it also challenged two other projects in Arizona ("Yuma Sector Projects 1 and 2").

After concluding that the Sierra Club and SBCC were likely to prevail on their claims that the transfers under § 8005 were unlawful and that these organizational plaintiffs had demonstrated a "likelihood of irreparable harm to their

members' aesthetic and recreational interests," the district court on May 24, 2019 granted a preliminary injunction enjoining Defendants from using transferred funds for "Yuma Sector Project 1 and El Paso Sector Project 1."[1]    In a companion order, however, the district court denied preliminary injunctive relief to the States.  Although the court held that New Mexico was likely to succeed on its claim that the transfers under § 8005 were unlawful, the court concluded that, in light of the grant of a preliminary injunction against El Paso Sector Project 1 to the Sierra Club and SBCC, New Mexico would not suffer irreparable harm from the denial of its duplicative request for such relief.  On May 29, 2019, Defendants appealed the preliminary injunction in favor of the Sierra Club and SBCC, and after the district court refused to stay that injunction, Defendants moved in this court for an emergency stay on June 3, 2019.  New Mexico did not appeal the district court's denial of its duplicative request for a preliminary injunction.

**2**

While the Defendants' emergency stay request was being briefed and considered in this court, California and New Mexico (but not the other States) moved for partial summary judgment on June 12, 2019.  The motion was limited to the issue of whether the transfers under § 8005 and § 9002 were lawful, and it requested corresponding declaratory relief, as well as a permanent injunction against the use of transferred funds for El Paso Sector Project 1 and El Centro Sector

---

[1] By the time the district court ruled, DoD had decided not to use funds transferred under § 8005 for any construction in Yuma Sector Project 2, and so the request for a preliminary injunction as to that project was moot.

Project 1.  The Sierra Club and SBCC filed a comparable summary judgment motion that same day, directed at those two projects, as well as at Yuma Sector Project 1 and three other Arizona projects ("Tucson Projects 1, 2, and 3"). Defendants filed cross-motions for summary judgment on the legality of the transfers under § 8005 and § 9002 with respect to the corresponding projects at issue in each case.

On June 28, 2019, the district court granted partial summary judgment and declaratory relief to both sets of plaintiffs, concluding that the transfers under § 8005 and § 9002 were unlawful.  The court granted permanent injunctive relief to the Sierra Club and SBCC against all six projects, but it denied any such relief to California and New Mexico.  The district court concluded that California and New Mexico had failed to prove a threat of future demonstrable environmental harm.  The court expressed doubts about the States' alternative theory that they had demonstrated injury to their sovereign interests, but the court ultimately concluded that it did not need to resolve that issue. As before, the district court instead held that California and New Mexico would not suffer any irreparable harm in light of the duplicative relief granted to the Sierra Club and SBCC. The district court denied Defendants' cross-motions for summary judgment in both cases.  Invoking its authority under Federal Rule of Civil Procedure 54(b), the district court entered partial judgments in favor of, respectively, the Sierra Club and SBCC, and California and New Mexico.  The district court denied Defendants' request to stay the permanent injunction pending appeal.

**3**

On June 29, 2019, Defendants timely appealed in both cases and asked this court to stay the permanent injunction in the *Sierra Club* case based on the same briefing and argument that had been presented in the preliminary injunction appeal in that case. California and New Mexico timely cross-appealed nine days later. On July 3, 2019, this court consolidated Defendants' appeal of the judgment and permanent injunction in the *Sierra Club* case with Defendants' pending appeal of the preliminary injunction.[2] That same day, a motions panel of this court issued a 2–1 published decision denying Defendants' motion for a stay of the permanent injunction (which had overtaken the preliminary injunction). *See Sierra Club v. Trump*, 929 F.3d 670 (9th Cir. 2019).

Defendants then applied to the Supreme Court for a stay of the permanent injunction pending appeal, which the Court granted on July 26, 2019. *See Trump v. Sierra Club*, 140 S. Ct. 1 (2019). That stay remains in effect "pending disposition of the Government's appeal in the United States Court of Appeals for the Ninth Circuit and disposition of the Government's petition for a writ of certiorari, if such writ is timely sought." *Id.* at 1. In granting the stay, the Court concluded that "the Government has made a sufficient showing at this stage that [the Sierra Club and SBCC] have no cause of action to obtain review of the Acting Secretary's compliance with Section 8005." *Id.*

---

[2] This court later consolidated the appeal and cross-appeal in the States' case with the already-consolidated appeals in the *Sierra Club* case.

## II

The Government has not contested the Article III standing of California and New Mexico on appeal, but as the majority notes, "'the court has an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties.'" *See* Maj. Opin. at 19 n.10 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)). As "an indispensable part of the plaintiff's case, each element" of Article III standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife* (*Lujan v. Defenders*), 504 U.S. 555, 561 (1992). Thus, although well-pleaded allegations are enough at the motion-to-dismiss stage, they are insufficient to establish standing at the summary-judgment stage. *Id.* "In response to a summary judgment motion, . . . the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." *Id.* (simplified).[3]

In reviewing standing *sua sponte* in the context of cross-motions for summary judgment, it is appropriate to apply the

---

[3] I favor the general practice of reciting the language of the quoted source as if that source were stating those exact words for the first time, thereby disregarding any indicia of quotations within quotations (such as brackets, ellipses, and multiple layers of quotation marks). Going forward, I will use the word "simplified" rather than "cleaned up," because it seems less colloquial and it avoids suggesting that the more precise quotation format needed "cleaning." Of course, if I make any changes to the simplified quotation, then those would be shown with brackets or ellipses.

more lenient standard that takes the *plaintiffs'* evidence as true and then asks whether a reasonable trier of fact could find Article III standing. *Lujan v. Defenders*, 504 U.S. at 563 (applying this standard in evaluating whether Government's cross-motion for summary judgment should have been granted). In their briefs below concerning the parties' cross-motions, California and New Mexico asserted that Defendants' allegedly unlawful conduct caused both harm to the States' sovereign interests in enforcing their environmental laws as well as actual environmental harm to animals and plants within the States. I agree that at least the second of these two asserted injuries—the threatened occurrence of actual environmental harm—is sufficient to establish Article III standing in this case, at least as to California.[4] Although the district court correctly recognized that the States' evidence of injury was very thin, *see infra* note 6, California's evidence is sufficient to establish standing at the summary-judgment stage.

Even assuming *arguendo* that the States must show a threat of injury to a protected *species* within their borders, rather than merely injury to individual animals or plants

---

[4] As the majority notes, *see* Maj. Opin. at 19 n.10, the district court explicitly addressed Article III standing to challenge the transfers only in the context of New Mexico's request for a preliminary injunction. Although Article III standing was not revisited when both California and New Mexico subsequently moved for summary judgment and a permanent injunction, the States' showing of injury in support of a permanent injunction provides a sufficient basis for evaluating their Article III standing.

belonging to such a species,[5] I think that California has made a sufficient showing. Accepting the States' evidence as true, and drawing all reasonable inferences in their favor, a reasonable trier of fact could conclude that the construction activities associated with El Centro Sector Project 1 in California could materially adversely affect the local population of flat-tailed horned lizards, which California has classified as a "Species of Special Concern." Specifically, California presented declarations from two biologists explaining how DoD's construction activities, and the resulting border barrier, would materially harm the lizard population by increasing opportunities for natural predators to catch lizards, by creating a "genetic break" between the populations within the species' small range area on either side of the barrier, and by accidentally killing a potentially significant number of lizards during the construction itself. This evidence is sufficient to establish an injury-in-fact to California's environmental interests. *Cf. Massachusetts v. EPA*, 549 U.S. 497, 521 (2007) (significant harm to ecosystem is an injury to the State for Article III standing purposes).[6]

---

[5] There are aspects to the States' arguments below—and of the majority opinion here—that seem implicitly to rest on the expansive view that the States would suffer cognizable injury-in-fact if there is harm to a *single* protected animal or to *any* of the plants in the construction area. Such theories push the outermost limits of plausible injury-in-fact, *cf. Lujan v. Defenders*, 504 U.S. at 566–67, but it is unnecessary to rely on them here.

[6] At the permanent-injunction stage, the district court found unpersuasive California's evidence of potential harm to this lizard species, especially when weighed against the Government's countervailing evidence of mitigation efforts. I do not necessarily disagree with that weighing of the competing evidence, but it addresses the injury issue in a different posture under different standards. The district court's denial of

California's showing of a material risk to a "Species of Special Concern" is fairly traceable to the challenged funding transfers and would be redressed by a favorable decision. *Lujan v. Defenders*, 504 U.S. at 560–61. It therefore suffices to give us Article III jurisdiction to address the merits of the States' causes of action. We thus may proceed to do so without having to address New Mexico's standing. *See Secretary of the Interior v. California*, 464 U.S. 312, 319 n.3 (1984) ("Since the State of California clearly does have standing, we need not address the standing of the other [plaintiffs], whose position here is identical to the State's."). And given my view that the States' legal challenges fail, I perceive no obstacle to entering judgment against *both* California and New Mexico without determining whether the latter has standing. *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 98 (1998).[7]

---

permanent injunctive relief reflected an exercise of *remedial discretion* after the court had found the transfers invalid as a matter of law. Accordingly, in weighing the States' evidence of injury in deciding how to exercise that discretion, the district court was not required to, and did not, evaluate the States' evidence of injury in the light most favorable to them (as we must do as to the standing issue here). *See Continental Airlines, Inc. v. Intra Brokers, Inc.*, 24 F.3d 1099, 1102 (9th Cir. 1994) (where district court granted summary judgment and permanent injunction, power to issue injunction was reviewed de novo, but "the district court's exercise of that power" was reviewed "for abuse of discretion").

[7] By contrast, New Mexico's standing is relevant to the scope of relief that can be afforded if, as the majority concludes, the § 8005 and § 9002 transfers are *invalid*. California suffers no injury from the construction activities concerning the El Paso Sector Project 1, and so California lacks standing to request or obtain relief that extends to that separate project. *Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("The remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established."). Accordingly, before affirming the district

## III

Our first task is to determine whether the States have asserted a viable cause of action that properly brings the lawfulness of the transfers before us. *See Air Courier Conf. v. American Postal Workers Union AFL-CIO*, 498 U.S. 517, 530–31 (1991). The majority holds that California and New Mexico have a valid cause of action under the APA. *See* Maj. Opin. at 30. I disagree with that conclusion, and I also disagree with the States' alternative arguments that they may assert either an equitable cause of action under the Constitution or an "ultra vires" cause of action.[8]

court's declaratory judgment that the use of funds transferred under § 8005 and § 9002 "for El Paso Sector Project 1 . . . is unlawful," the majority properly examines New Mexico's standing. I express no view as to whether the majority is correct in concluding that New Mexico's evidence of environmental harm was sufficient, notwithstanding the district court's conclusion that this evidence rested largely on unsupported speculation. *See* Maj. Opin. at 23–24; *cf. California v. Trump*, 2019 WL 2715421, at *4 (N.D. Cal. June 28, 2019) ("New Mexico's speculation that a border barrier *might* prevent interbreeding, which *might* hamper genetic diversity, which *might* render Mexican wolves *more susceptible* to diseases falls far short of the necessary demonstrable evidence of harm to a protected species"). However, for the reasons expressed below, I disagree with the majority's conclusion that New Mexico and California have standing based on their inability to enforce their environmental laws. Maj. Opin. at 24–28. Given that this asserted injury is due to the Secretary of Homeland Security's waiver under § 102 of IIRIRA, and not to the funding transfers, it would not be redressed by an injunction aimed only at the transfers. *See infra* at 68–70.

**[8]** In its merits analysis, the majority scarcely cites the motions panel's published decision, which addressed the Sierra Club's and SBCC's likelihood of success on the merits of many of the same issues before us. I agree with the majority's implicit conclusion that the motions panel's opinion does not prevent this merits panel from examining these issues afresh. Although the motions panel decision is a precedent, it remains

## A

In authorizing suit by any person "adversely affected or aggrieved by agency action within the meaning of a relevant statute," 5 U.S.C. § 702, the APA incorporates the familiar zone-of-interests test, which reflects a background principle of law that always "applies unless it is expressly negated," *Bennett v. Spear*, 520 U.S. 154, 163 (1997); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014).[9]  That test requires a plaintiff to "establish that the injury he complains of (*his* aggrievement, or the adverse effect *upon him*) falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Lujan v. NWF*, 497 U.S. at 883 (quoting *Clarke v. Securities Indus. Ass'n*, 479 U.S.

---

subject to reconsideration by this court until we issue our mandate. *See United States v. Houser*, 804 F.2d 565, 567–68 (9th Cir. 1986) (distinguishing, on this point, between reconsideration of a prior panel's decision "during the course of a single appeal" and a decision "on a prior appeal"); *cf. Gonzalez v. Arizona*, 677 F.3d 383, 389 n.4 (9th Cir. 2012) (en banc) (three-judge panel lacks authority to overrule a decision in a prior appeal in the same case). To the extent that *Lair v. Bullock*, 798 F.3d 736, 747 (9th Cir. 2015), suggests otherwise, that suggestion is dicta and directly contrary to our decision in *Houser*. *See East Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1261–65 (9th Cir. 2020). In all events, the precedential force of the motions panel's opinion was largely, if not entirely, vitiated by the Supreme Court's subsequent decision to grant the very stay that the motions panel's opinion denied.

[9] The Supreme Court has not squarely addressed whether the zone-of-interests test applies to a plaintiff who claims to have "suffer[ed] legal wrong because of agency action," which is the other class of persons authorized to sue under the APA, 5 U.S.C. § 702. *See Lujan v. National Wildlife Fed.* (*Lujan v. NWF*), 497 U.S. 871, 882–83 (1990). The States have not invoked any such theory here, so I have no occasion to address it.

388, 396–97 (1987)).  This test "is not meant to be especially demanding."  *Clarke*, 479 U.S. at 399.  Because the APA was intended to confer "generous review" of agency action, the zone-of-interests test is more flexibly applied under that statute than elsewhere, and it requires only a showing that the plaintiff is "*arguably* within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Serv. Orgs., Inc. v. Camp* (*Data Processing*), 397 U.S. 150, 153, 156 (1970) (emphasis added); *see also Bennett*, 520 U.S. at 163 ("what comes within the zone of interests of a statute for purposes of obtaining judicial review of administrative action under the generous review provisions of the APA may not do so for other purposes") (simplified).  Because an APA plaintiff need only show that its interests are "arguably" within the relevant zone of interests, "the benefit of any doubt goes to the plaintiff."  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012). Although these standards are generous, the States have failed to satisfy them.

**1**

In applying the zone-of-interests test, we must first identify the "statutory provision whose violation forms the legal basis for [the] complaint" or the "gravamen of the complaint." *Lujan v. NWF*, 497 U.S. at 883, 886; *see also Air Courier Conf.*, 498 U.S. at 529.  That question is easy here. The States' complaint alleges that the transfers made by DoD "do not satisfy the criteria under section 8005"; that Defendants therefore "have acted ultra vires in seeking to transfer funding pursuant to section 8005"; that DoD consequently "acted unconstitutionally and in excess of [its] statutory authority in diverting federal funds" pursuant to

§ 8005; and that therefore "these actions are unlawful and should be set aside under 5 U.S.C. section 706."[10]   Section 8005 is plainly the "gravamen of the complaint," and it therefore defines the applicable zone of interests.  *Lujan v. NWF*, 497 U.S. at 886.

Although the States invoke the Appropriations Clause and the constitutional separation of powers in contending that Defendants' actions are "unlawful" within the meaning of the APA, any such constitutional violations here can be said to have occurred *only if* the transfers violated the limitations set forth in § 8005: if Congress authorized DoD to transfer the appropriated funds from one account to another, and to spend them accordingly, then the money has been spent "in Consequence of Appropriations made by Law," U.S. CONST. art. I, § 9, cl. 7, and the Executive has not otherwise transgressed the separation of powers.[11]  *All* of California's theories for challenging the transfers under the APA— whether styled as constitutional claims or as statutory claims—thus rise or fall based on whether DoD has transgressed the limitations on transfers set forth in § 8005. As a result, § 8005 is obviously the "statute whose violation is the gravamen of the complaint."  *Lujan v. NWF*, 497 U.S. at 886.   To maintain a claim under the APA, therefore, California must establish that it is within the zone of interests

---

[10] Because the limitations on transfers set forth in § 8005 also apply to transfers under § 9002, *see* 132 Stat. at 3042, the parties use "§ 8005" to refer to both provisions, and I will generally do so as well.

[11] The only possible exception is the States' argument that § 8005 *itself* violates the Appropriations Clause and the constitutional separation of powers.  As explained below, that contention is frivolous. *See infra* at 76–77.

of § 8005.  On this point, the majority and I are in apparent agreement.  *See* Maj. Opin. at 30–31.[12]

**2**

Having identified the relevant statute, our next task is to "discern the interests arguably to be protected by the statutory provision at issue" and then to "inquire whether the plaintiff's interests affected by the agency action in question are among them."  *National Credit Union Admin. v. First Nat'l Bank & Trust Co.* (*NCUA*), 522 U.S. 479, 492 (1998) (simplified).  Identifying the interests protected by § 8005 is not difficult, and here the States' asserted interests are not among them.

Section 8005 is a grant of general transfer authority that allows the Secretary of Defense, if he determines "that such action is necessary in the national interest" and if the Office of Management and Budget approves, to transfer from one DoD "appropriation" into another up to $4 billion of the funds that have been appropriated under the DoD Appropriations Act "for military functions (except military construction)."  *See* 132 Stat. at 2999.  Section 8005 contains

---

[12] The States briefly contend that DoD has exceeded its authority under § 284, but even assuming *arguendo* that the States have a cause of action to raise such a challenge, it is patently without merit.  The States note that § 284 contains a special reporting requirement for "small scale construction" projects, which are defined as projects costing $750,000 or less, 10 U.S.C. § 284(h)(1)(B), (i)(3), and they argue that this shows that Congress did not authorize projects on the scale at issue here.  The inference is a non sequitur: the fact that Congress requires special reporting of these smaller projects does not mean that they are the *only* projects authorized.  Congress may have imposed such a unique reporting requirement in order to capture the sort of smaller-scale activities that might otherwise have escaped its notice.

five provisos that further regulate this transfer authority, and the only limitations on the Secretary's authority that the States claim were violated here are all contained in the first such proviso. That proviso states that "such authority to transfer may not be used unless for higher priority items, based on unforeseen military requirements, than those for which originally appropriated and in no case where the item for which funds are requested has been denied by the Congress." *Id.*[13] The remaining provisos require prompt notice to Congress "of all transfers made pursuant to this authority or any other authority in this Act"; proscribe the use of funds to make requests to the Committees on Appropriations for reprogrammings that are inconsistent with the restrictions described in the first proviso; set a time limit for making requests for multiple reprogrammings; and exempt "transfers among military personnel appropriations" from counting towards the $4 billion limit. *Id.*

Focusing on "the particular provision of law upon which the plaintiff relies," *Bennett*, 520 U.S. at 175–76, makes clear that § 8005 as a whole, and its first proviso in particular, are aimed at tightening congressional control over the appropriations process. The first proviso's general prohibition on transferring funds for any item that "has been denied by the Congress" is, on its face, a prohibition on using the transfer authority to effectively reverse Congress's specific decision to deny funds to DoD for that item. 132 Stat. at 2999. The second major limitation imposed by the first proviso states that the transfer authority is not to be used unless, considering the items "for which [the funds

---

[13] Similar language has been codified into permanent law. *See* 10 U.S.C. § 2214(b). No party contends that § 2214(b) alters the relevant analysis under the comparably worded provision in § 8005.

were] originally appropriated," there are "higher priority items" for which the funds should now be used in light of "military requirements" that were "unforeseen" in DoD's request for Fiscal Year 2019 appropriations. *Id*. The obvious focus of this restriction is likewise to protect congressional judgments about appropriations by (1) restricting DoD's ability to *reprioritize* the use of funds differently from how Congress decided to do so and (2) precluding DoD from transferring funds appropriated by Congress for "military functions" for purposes that do not reflect "military requirements." The remaining provisos, including the congressional reporting requirement, all similarly aim to maintain congressional control over appropriations. And all of the operative restrictions in § 8005 that the States invoke here are focused *solely* on limiting DoD's ability to use the transfer authority to reverse the congressional judgments reflected in *DoD's* appropriations.

In addition to preserving congressional control over DoD's appropriations, § 8005 also aims to give DoD some measure of flexibility to make necessary changes. Notably, in authorizing the Secretary to make transfers among appropriations, § 8005's first proviso specifies only *one* criterion that he must consider in exercising that discretion: he must determine whether the item for which the funds will be used is a "*higher priority* item[]" in light of "unforeseen *military* requirements." 132 Stat. at 2999 (emphasis added). Under the statute, he need not consider any other factor concerning either the original use for which the funds were appropriated or the new use to which they will now be put.

In light of these features of § 8005, the "interests" that the States claim are "affected by the agency action in question" are not "among" the "interests arguably to be protected" by

§ 8005. *NCUA*, 522 U.S. at 492 (simplified). In particular, the States' asserted environmental interests clearly lie outside the zone of interests protected by § 8005. The statute does not mention environmental interests, nor does it require the Secretary to consider such interests. On the contrary, the statute requires him only to consider whether an item is a "higher priority" in light of "military requirements," and it is otherwise entirely neutral as to the uses to which the funds will be put. Indeed, that neutrality is reflected on the face of the statute, which says that, once the transfer is made, the funds are "merged with and . . . available *for the same purposes*, and for the same time period, *as the appropriation or fund to which transferred*." 132 Stat. at 2999 (emphasis added). Because the alleged environmental harms that the States assert here play no role in the analysis that § 8005 requires the Secretary to conduct, and are not among the harms that § 8005's limitations seek to address or protect, the States' interests in avoiding these harms are not within § 8005's zone of interests.

Moreover, focusing on the specific interests for which the States have presented sufficient evidentiary support at the summary-judgment stage, *see Lujan v. NWF*, 497 U.S. at 884–85, further confirms that, in deciding whether to redirect excess military personnel funds under § 8005 to assist DHS by building fencing to stop international drug smuggling, the Acting Secretary of Defense did not have to give even the slightest consideration to whether that reprogramming of funds would result in the death of more flat-tailed horned lizards.[14] Put simply, the States'

---

[14] It is unnecessary to exhaustively review whether California or New Mexico has provided the requisite factual support with respect to their claims of potential harms to *other* species of animals or plants, *see supra*

environmental interests are "'so marginally related to . . . the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Patchak*, 567 U.S. at 225 (quoting *Clarke*, 479 U.S. at 399).

For similar reasons, the States' invocation of their *sovereign* interests is also insufficient. The majority finds that these interests "app[ly] with particular force" because the Secretary's transfer of funds *ultimately* had an effect on "California's and New Mexico's ability to enforce their state environmental laws," *see* Maj. Opin. at 34, but that consideration plays no role—not even indirectly—in the analysis that § 8005 requires. Section 8005 authorizes the Secretary to move funds from one appropriation to another if (1) that transfer is consistent with the appropriations-process-based constraints discussed earlier; and (2) the transfer is for items that the Secretary deems to be "higher priority" in light of "military requirements." 132 Stat. at 2999. The statute does not itself mention or contemplate the displacement of state laws as a result of the transfer, nor does it require that any such derogation from state sovereignty be considered in evaluating the proposed transfer. Moreover, here the ultimate preemption of state law occurred, not as a result of § 8005, but rather as a result of DHS's separate determination, under a completely separate statute (*viz.*, IIRIRA § 102(c)), that state (and federal) environmental laws would be waived. The States might perhaps be within the zone of interests with respect to *that* statute, but they do not challenge the validity of that waiver under § 102(c) in this case, and in any event, California has already brought (and lost) a challenge to an earlier § 102(c) waiver with respect to a similar border

note 7, because there is no basis in law or logic for concluding that it would make any difference to the zone-of-interests analysis under § 8005.

fencing project. *See In re Border Infrastructure Envtl. Litig.*, 915 F.3d 1213 (9th Cir. 2019).

The States nonetheless insist that they are within § 8005's zone of interests because the actual *activities* that are taking place under the valid waiver, in derogation of their sovereignty, are only occurring because the § 8005 transfer was approved. This argument fails. Once a valid § 102(c) waiver has been issued, the States' laws have been definitively set aside as a *de jure* matter under the Supremacy Clause, and halting construction will *not* bring those laws back into force or redress that injury to the States' sovereignty. The residual interest on which the States rely, therefore, is not an injury to their sovereignty, but merely the interest in ensuring that activities that the States consider undesirable do not occur. But the Supreme Court has consistently held that "assertion of a right to a particular kind of Government conduct, which the Government has violated by acting differently, cannot alone satisfy the requirements of Art. III without draining those requirements of meaning," *Lujan v. Defenders*, 504 U.S. at 576 (simplified), and an interest that is not cognizable for Article III purposes is irrelevant for zone-of-interests purposes as well, *Sierra Club v. Morton*, 405 U.S. 727, 733 (1972). Similarly, to the extent that the States rely on an interest in "hav[ing] the Government act in accordance with law" such as § 8005, *see Lujan v. Defenders*, 504 U.S. at 575, such an interest is not cognizable under Article III and cannot satisfy the zone-of-interests test here.

**3**

The majority makes two main arguments as to why the States nonetheless fall within § 8005's zone of interests, but neither has merit.

First, the majority contends that "the states regularly benefit from DoD's use of Section 8005," and it cites several past examples in which the statute was used to transfer funds that allowed the military to assist in addressing storm damage from hurricanes that occurred in various States. *See* Maj. Opin. at 35–36. This argument is foreclosed by the Supreme Court's decision in *Lujan v. NWF*. The Court in that case held that, because satisfaction of the zone-of-interests test is an element of the cause of action that the plaintiff seeks to invoke, the plaintiff at the summary-judgment stage has the burden "to set forth specific facts (even though they may be controverted by the Government) showing that he has satisfied its terms," *i.e.*, that "the injury he complains of (*his* aggrievement, or the adverse effect *upon him*)" falls within the relevant statute's zone of interests. 497 U.S. at 883–84. Here, in opposing summary judgment, California and New Mexico made no showing whatsoever that, in the absence of these transfers to the "Drug Interdiction and Counter-Drug Activities, Defense" appropriation, the funds in question would otherwise have been transferred for the direct benefit of either State. Absent such an evidentiary showing, the States have failed to show that they satisfy the zone-of-interests test under such a theory. *Id*. at 882–99 (exhaustively analyzing the evidence presented at summary judgment and concluding that the plaintiffs had failed to carry their burden under the zone-of-interests test).

Second, the majority asserts that California and New Mexico fall within § 8005's zone of interests because § 8005 was "primarily intended to benefit [Congress] and its constitutional power to manage appropriations," and the States' "interests are *congruent* with those of Congress." *See* Maj. Opin. at 32–33 (emphasis added). This theory also fails. As the Supreme Court made clear in *Lujan v. NWF*, the zone-of-interests test requires the plaintiff to make a factual showing that the plaintiff itself, or someone else whose interests the plaintiff may properly assert, has a cognizable interest that falls within the relevant statute's zone of interests. 497 U.S. at 885–99 (addressing whether the interests of NWF—or of any of its members, whose interests NWF could validly assert under the associational standing doctrine of *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333 (1977)—had been shown to be within the relevant zone of interests). I am aware of no precedent that would support the view that California and New Mexico can *represent* the interests of Congress (akin to NWF's representation of the interests of its members), much less that the States can do so merely because they are sympathetic to Congress's perceived policy objectives.[15] But I do not read the majority opinion as actually relying on such a novel theory. Instead, the majority suggests that, merely because the States' overall litigation objectives here are sufficiently

---

[15] Even if the States could assert Congress's interests in some representational capacity, they could do so only if the injury to Congress's interests satisfied the requirements of Article III standing. *See Air Courier Conf.*, 498 U.S. at 523–24 (zone-of-interests test is applied to those injuries-in-fact that meet Article III requirements). I express no view on that question. *Cf. U.S. House of Reps. v. Mnuchin*, 379 F. Supp. 3d 8 (D.D.C. 2019) (holding that House lacks Article III standing to challenge the transfers at issue here), *appeal ordered heard en banc*, 2020 WL 1228477 (D.C. Cir. 2020).

congruent with those of Congress, the States have thereby satisfied the zone-of-interests test with respect to the States' *own* interests. This contention is clearly wrong.

The critical flaw in the majority's analysis is that it rests, not on the *interests* asserted by the States (preservation of the flat-tailed horned lizard, etc.), but on the *legal theory* that the States invoke to protect those interests here. But the zone-of-interests test focuses on the former and not the latter. *See Lujan v. NWF*, 497 U.S. at 885–89. Indeed, if the majority were correct, that would effectively eliminate the zone-of-interests test. By definition, *anyone* who alleges a violation of a particular statute has thereby invoked a legal theory that is "congruent" with the interests of those *other* persons or entities who *are* within that statute's zone-of-interests. Such a tautological congruence between the States' legal theory and Congress's institutional interests is not sufficient to satisfy the zone-of-interests test here.

The majority suggests that its approach is supported by the D.C. Circuit's decision in *Scheduled Airlines Traffic Offices, Inc. v. Department of Defense*, 87 F.3d 1356 (D.C. Cir. 1996), *see* Maj. Opin. at 32, but that is wrong. As the opinion in that case makes clear, the D.C. Circuit was relying on the same traditional zone-of-interests test, under which a plaintiff's interests are "outside the statute's 'zone of interests' only 'if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" 87 F.3d at 1360 (quoting *Clarke*, 479 U.S. at 399). The court mentioned "congruence" in the course of explaining why the plaintiff's interests in that case were "not more likely to frustrate than to further statutory objectives," *i.e.*, why those interests were not

*inconsistent* with the purposes implicit in the statute. *Id.* (simplified). It did not thereby suggest—and could not properly have suggested—that the mere lack of any such inconsistency is alone sufficient under the zone-of-interests test. Here, the problem is not that the States' interests are inconsistent with the purposes of § 8005, but rather that they are too "marginally related" to those purposes. *See supra* at 68–69.

Lastly, the majority suggests that we must apply the zone-of-interests test "broadly in this context," because—given the difficulties that congressional plaintiffs have in establishing Article III standing—otherwise "no agency action taken pursuant to Section 8005 could ever be challenged under the APA." *See* Maj. Opin. at 33, 36. The assumption that no one will ever be able to sue for any violation of § 8005 seems doubtful, *cf. Sierra Club v. Trump*, 929 F.3d at 715 (N.R. Smith, J., dissenting) (suggesting that "those who would have been entitled to the funds as originally appropriated" may be within the zone of interests of § 8005), but in any event, we are not entitled to bend the otherwise applicable—and already lenient—standards to ensure that someone will be able to sue in this case or others like it.

## B

In addition to asserting claims under the APA, California and New Mexico also purport to assert claims under the Constitution, as well as an equitable cause of action to enjoin "ultra vires" conduct. The States do not have a cause of action under either of these theories.

**1**

The States contend that they are not required to satisfy any zone-of-interests test to the extent that they assert non-APA causes of action to enjoin Executive officials from taking *unconstitutional* action.[16]  Even assuming that an equitable cause of action to enjoin unconstitutional conduct exists alongside the APA's cause of action, *see Juliana v. United States*, 947 F.3d 1159, 1167–68 (9th Cir. 2020); *Navajo Nation v. Department of the Interior*, 876 F.3d 1144, 1172 (9th Cir. 2017); *but see Sierra Club v. Trump*, 929 F.3d at 715–17 (N.R. Smith, J., dissenting), it avails the States nothing here.  The States have failed to allege the sort of constitutional claim that might give rise to such an equitable action, because their "constitutional" claim is effectively the very same § 8005-based claim dressed up in constitutional garb.  And even if this claim counted as a "constitutional" one, it would still be governed by the same zone of interests defined by the relevant limitations in § 8005.

**a**

The States assert two constitutional claims in their operative complaint: (1) that Defendants have violated the

---

[16] It is not entirely clear that the States are contending that their *APA claims* to enjoin *unconstitutional* conduct, *see* 5 U.S.C. § 706(2)(B), are exempt from the zone-of-interests test.  To the extent that they are so contending, the point seems doubtful.  *See Data Processing*, 397 U.S. at 153 (zone-of-interests test requires APA claimant to show that its interest "is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question").  But in all events, any such APA-based claim to enjoin unconstitutional conduct would fail for the same reasons as the States' purported free-standing equitable claim to enjoin such conduct.

Presentment Clause, and the constitutional separation of powers more generally, by "unilaterally diverting funding that Congress already appropriated for other purposes to fund a border wall for which Congress has provided no appropriations"; and (2) that Defendants have violated the Appropriations Clause "by funding construction of the border wall with funds that were not appropriated for that purpose." As clarified in their subsequent briefing, the States assert both what I will call a "strong" form of these constitutional arguments and a more "limited" form. In its strong form, the States' argument is that, *even if § 8005 authorized the transfers in question here*, those transfers nonetheless violated the separation of powers, the Presentment Clause, and the Appropriations Clause. In its more limited form, the States' argument is that the transfers violated the separation of powers, the Presentment Clause, and the Appropriations Clause *because* the transfers were not authorized by § 8005.

I need not address whether the States have an equitable cause of action to assert the strong form of their constitutional argument, because in my view that argument on the merits is so "wholly insubstantial and frivolous" that it would not even give rise to federal jurisdiction. *Bell v. Hood*, 327 U.S. 678, 682–83 (1946); *see also Steel Co.*, 523 U.S. at 89. If § 8005 *allowed* the transfers here, then that necessarily means that the Executive has properly spent funds that Congress, by statute, has *appropriated* and allowed to be spent for *that* purpose. The States cite no authority for the extraordinary proposition that the Appropriations Clause itself constrains *Congress's* ability to give agencies latitude in how to spend appropriated funds, and I am aware of no such authority. *Cf. Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) ("allocation of funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed

to agency discretion"). And by transferring funds after finding that the statutory conditions for doing so are met, an agency thereby "execut[es] the policy that Congress had embodied in the statute" and does not unilaterally alter or repeal any law in violation of the Presentment Clause or the separation of powers. *See Clinton v. City of New York*, 524 U.S. 417, 444 (1998). If anything, it is the States' theory—that the federal courts must give effect to an alleged broader congressional judgment against border funding *regardless* of whether that judgment is embodied in binding statutory language—that would offend separation-of-powers principles.

That leaves only the more limited form of the States' argument, which is that, *if* § 8005 did not authorize the transfers, *then* the expenditures violated the Appropriations Clause, the Presentment Clause, and the separation of powers. Under *Dalton v. Specter*, 511 U.S. 462 (1994), this theory—despite its constitutional garb—is properly classified as "a statutory one," *id*. at 474. It therefore does not fall within the scope of the asserted non-APA equitable cause of action to enjoin *unconstitutional* conduct.[17]

In *Dalton*, the Court addressed a non-APA claim to enjoin Executive officials from implementing an allegedly unconstitutional Presidential decision to close certain military bases under the Defense Base Closure and Realignment Act

---

[17] There remains the States' claim that *statutory* violations may be enjoined under a non-APA ultra vires cause of action for equitable relief, but that also fails for the reasons discussed below. *See infra* at 84–85.

of 1990. 511 U.S. at 471.[18]  But the claim in *Dalton* was not that the President had directly transgressed an applicable constitutional limitation; rather, the claim was that, *because* Executive officials "violated the procedural requirements" of the statute on which the President's decision ultimately rested, the President thereby "act[ed] in excess of his statutory authority" and therefore "violate[d] the constitutional separation-of-powers doctrine." *Id*. at 471–72. The Supreme Court rejected this effort to "eviscerat[e]" the well-established "distinction between claims that an official exceeded his *statutory* authority, on the one hand, and claims that he acted in violation of the *Constitution*, on the other." *Id*. at 474 (emphasis added).  As the Court explained, its "cases do not support the proposition that every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id.* at 472.  The Court distinguished *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), on the ground that there "the Government disclaimed any statutory authority for the President's seizure of steel mills," and as a result the Constitution itself supplied the rule of decision for determining the legality of the President's actions. *Dalton*, 511 U.S. at 473.  Because the "only basis of authority asserted was the President's inherent constitutional power as the Executive and the Commander in Chief of the Armed Forces," *Youngstown* thus "necessarily turned on *whether the Constitution authorized* the President's actions." *Id*. (emphasis added).  By contrast, given that the claim in *Dalton* was that the President had violated the Constitution

---

[18] The plaintiffs in *Dalton* also asserted a claim under the APA itself, but that claim failed for the separate reason that the challenged final action was taken by the President personally, and the President is not an "agency" for purposes of the APA.  *See* 511 U.S. at 469.

*because* Executive officials had "violated the terms of the 1990 Act," the terms of that statute provided the applicable rule of decision and the claim was therefore "a statutory one." *Id*. at 474. And because those claims sought to enjoin conduct on the grounds that it violated *statutory* requirements, it was subject to the "longstanding" limitation that non-APA "review is not available when the statute in question commits the decision to the discretion of the President." *Id*.

Under *Dalton*, the States' purported "constitutional" claims—at least in their more limited version—are properly classified as *statutory* claims that do *not* fall within any non-APA cause of action to enjoin unconstitutional conduct. 511 U.S. at 474. Here, as in *Dalton*, Defendants have "claimed" the "statutory authority" of § 8005, and any asserted violation of the Constitution would occur *only if, and only because,* Defendants' conduct is assertedly not authorized by § 8005. *Id*. at 473. The rule of decision for *this* dispute is thus not supplied, as in *Youngstown*, by the Constitution; rather, it is supplied only by § 8005. *Id*. at 473–74. Because these claims by the States are thus "statutory" under *Dalton*, they may only proceed, if at all, under an equitable cause of action to enjoin ultra vires conduct, and they would be subject to any limitations applicable to such claims. *Id*. at 474. The States do assert such a fallback claim here, but it fails for the reasons I explain below. *See infra* at 84–85.

**b**

But even if the States' claims may properly be classified as *constitutional* ones for purposes of the particular equitable cause of action they invoke here, those claims would still fail.

To the extent that the States argue that the Constitution *itself* grants a cause of action allowing *any plaintiff with an Article III injury* to sue to enjoin an alleged violation of the Appropriations Clause, the Presentment Clause, or the separation of powers, there is no support for such a theory. None of the cases cited by the States involved putative plaintiffs, such as the States here, who are near the outer perimeter of Article III standing. On the contrary, these cases involved either allegedly unconstitutional agency actions *directly targeting* the claimants, *see Bond v. United States*, 564 U.S. 211, 225–26 (2011) (criminal defendant challenged statute under which she was convicted on federalism and separation-of-powers grounds); *United States v. McIntosh*, 833 F.3d 1163, 1174–75 (9th Cir. 2016) (criminal defendants sought to enjoin, based on an appropriations rider and the Appropriations Clause, the Justice Department's expenditure of funds to prosecute them), or they involved a suit based on an express *statutory* cause of action, *see Clinton v. City of New York*, 524 U.S. at 428 (noting that right of action was expressly conferred by 2 U.S.C. § 692(a)(1) (1996 ed.)).

Moreover, any claim that the Constitution *requires* recognizing, in this context, an equitable cause of action that extends to the outer limits of Article III seems difficult to square with the Supreme Court's decision in *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015). There, the Court rejected the view that the Supremacy Clause itself created a private right of action for equitable relief against preempted statutes, and instead held that any such equitable claim rested on "judge-made" remedies that are subject to "express and implied statutory limitations." *Id*. at 325–27. The Supremacy Clause provides a particularly apt analogy here, because (like the Appropriations Clause) the asserted "unconstitutionality" of the challenged action generally

depends upon whether it falls *within or outside the terms of a federal statute*: a state statute is "unconstitutional under the Supremacy Clause" only if it is "contrary to federal law," *Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank*, 136 F.3d 1360, 1361–62 (9th Cir. 1998), and here, the transfers violated the Appropriations Clause only if they were barred by the limitations in § 8005. And just as the Supremacy Clause protects Congress's "broad discretion with regard to the enactment of laws," *Armstrong*, 575 U.S. at 325–26, so too the Appropriations Clause protects "congressional control over funds in the Treasury," *McIntosh*, 833 F.3d at 1175. It is "unlikely that the Constitution gave Congress such broad discretion" to enact appropriations laws only to simultaneously "*require[]* Congress to permit the enforcement of its laws" by *any* "private actor[]" with even minimal Article III standing, thereby "*limit[ing]* Congress's power" to decide how "to enforce" the spending limitations it enacts. *Armstrong*, 575 U.S. at 325–26.

The Appropriations Clause thus does not itself create a constitutionally required cause of action that extends to the limits of Article III. On the contrary, any equitable cause of action to enforce that clause would rest on a "judge-made" remedy: as *Armstrong* observed, "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." 575 U.S. at 327. At least where, as here, the contours of the applicable constitutional line (under the Appropriations Clause) are defined by and parallel a statutory line (under § 8005), any such judge-made equitable cause of action would be subject to "express and implied statutory limitations," as well as traditional limitations governing such equitable claims. *Id.*

One long-established "'judicially self-imposed limit[] on the exercise of federal jurisdiction'"—including federal equitable jurisdiction—is the requirement "that a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." *Bennett*, 520 U.S. at 162 (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). This limitation is *not* confined to the APA, but rather reflects a "prudential standing requirement[] of general application" that always "applies unless it is expressly negated" by Congress. *Id*. at 163.[19] Because Congress has not expressly negated that test in any relevant respect, the States' equitable cause of action to enforce the Appropriations Clause here remains subject to the zone-of-interests test. *Cf. Thompson v. North American Stainless, LP*, 562 U.S. 170, 176–77 (2011) (construing a cause of action as extending to "any person injured in the Article III sense" would often produce "absurd consequences" and is for that reason rarely done). And given the unique nature of an Appropriations Clause claim, as just discussed, *the line between constitutional and unconstitutional conduct* here is defined entirely by the limitations in § 8005, and therefore the

---

[19] The States wrongly contend that, by quoting this language from *Bennett*, and stating that the zone-of-interests test therefore "applies to all *statutorily* created causes of action," *Lexmark*, 572 U.S. at 129 (emphasis added), the Court in *Lexmark* thereby intended to signal that the test *only* applies to statutory claims and not to non-statutory equitable claims. Nothing in *Lexmark* actually suggests any such negative pregnant; instead, the Court's reference to "statutorily created causes of action" reflects nothing more than the fact that only statutory claims were before the Court in that case. *See id*. at 129. Moreover, *Lexmark* notes that the zone-of-interests test's roots lie in the common law, *id*. at 130 n.5, and *Bennett* (upon which *Lexmark* relied) states that the test reflects a "prudential standing requirement[] of general application" that applies to any "exercise of federal jurisdiction," 520 U.S. at 162–63.

relevant zone of interests for the States' Appropriations-Clause-based equitable claim remains defined by *those* limitations.  The States are thus outside the applicable zone of interests for this claim as well.

In arguing for a contrary view, the States rely heavily on *United States v. McIntosh*, asserting that there we granted non-APA injunctive relief based on the Appropriations Clause without inquiring whether the claimants were within the zone of interests of the underlying appropriations statute. *McIntosh* cannot bear the considerable weight that the States place on it.

In *McIntosh*, we asserted interlocutory jurisdiction over the district courts' refusal to enjoin the expenditure of funds to prosecute the defendants—an expenditure that allegedly violated an appropriations rider barring the Justice Department from spending funds to prevent certain States from "'implementing their own laws that authorize the use, distribution, possession, or cultivation of medical marijuana.'"  833 F.3d at 1175; *see also id.* at 1172–73.  We held that the defendants had Article III standing and that, if the Department was in fact "spending money in violation" of that rider in prosecuting the defendants, that would produce a violation of the Appropriations Clause that could be raised by the defendants in challenging their prosecutions.  *Id.* at 1175.  After construing the meaning of the rider, we then remanded the matter for a determination whether the rider was being violated.  *Id.* at 1179.  Contrary to the States' dog-that-didn't-bark theory, nothing can be gleaned from the fact that the zone-of-interests test was never discussed in *McIntosh*.  *See Cooper Indus., Inc. v. Aviall Servs, Inc.*, 543 U.S. 157, 170 (2004) ("'Questions which merely lurk in the record, neither brought to the attention of the court nor

ruled upon, are not to be considered as having been so decided as to constitute precedents.'") (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)). Moreover, any such silence seems more likely to have been due to the fact that it was so overwhelmingly obvious that the defendants *were* within the rider's zone of interests that the point was incontestable and uncontested. An asserted interest in not going to prison for *complying* with state medical-marijuana laws seems well within the zone of interests of a statute prohibiting interference with the implementation of such state laws.

**2**

The only remaining question is whether the States may evade the APA's zone-of-interests test by asserting a non-APA claim for ultra vires conduct in excess of *statutory* authority. Even assuming that such a cause of action exists alongside the APA, *cf. Trudeau v. Federal Trade Comm'n*, 456 F.3d 178, 189–90 (D.C. Cir. 2006), I conclude that it would be subject to the same zone-of-interests limitations as the States' APA claims and therefore likewise fails.

For the same reasons discussed above, any such equitable cause of action rests on a judge-made remedy that is subject to the zone-of-interests test. *See supra* at 79–84. The States identify no case from this court affirmatively holding that the zone-of-interests test does *not* apply to a non-APA equitable cause of action to enjoin conduct allegedly in excess of *statutory* authority, and I am aware of none. Indeed, it makes little sense, when evaluating a claim that Executive officials exceeded the *limitations* in a federal statute, not to ask whether the plaintiff is within the zone of interests protected by those statutory limitations. *Cf. Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 811 n.14 (D.C. Cir. 1987) (although

plaintiff asserting ultra vires claim may not need to show that its interests "fall within the zones of interests of the constitutional and statutory *powers* invoked" by Executive officials, when "a particular constitutional or statutory provision was intended to protect persons like the litigant by *limiting* the authority conferred," then "the litigant's interest may be said to fall within the zone protected by the *limitation*") (emphasis added).[20]

\*          \*          \*

Given that each of the States' asserted theories fail, the States lack any cause of action to challenge the DoD's transfer of funds under § 8005.

# IV

Alternatively, even if the States had a cause of action, their claims would fail on the merits, because the challenged transfers did not violate § 8005 or § 9002. The States argue that the transfers violated the first proviso of § 8005, which states that the transfer authority granted by that section "may not be used unless for higher priority items, based on unforeseen military requirements, than those for which originally appropriated and in no case where the item for which funds are requested has been denied by the Congress."

---

[20] Even if the States were correct that the zone-of-interests test does not apply to a non-APA equitable cause of action, that would not necessarily mean that such equitable jurisdiction extends, as the States suggest, to the outer limits of Article III. Declining to apply the APA's generous zone-of-interests test might arguably render applicable the sort of narrower review of agency action that preceded the APA standards articulated in *Data Processing*, 397 U.S. at 153. *See also Clarke*, 479 U.S. at 400 n.16.

132 Stat. at 2999.  The requirements of this proviso likewise limit the transfer authority under § 9002.  *See id.* at 3042 (stating that the transfer authority in § 9002 is in addition to that specified in § 8005, but "is subject to the same terms and conditions as the authority provided in section 8005 of this Act").  The States argue, and the majority agrees, that two of the requirements in this proviso are not met, because (1) the transfers were for an item for which Congress has denied funding; and (2) they were not for "unforeseen military requirements."  *See* Maj. Opin. at 37–47.  I disagree.

## A

The proviso states that the Secretary may not transfer funds for an admittedly "higher priority item[] . . . than those for which originally appropriated" if "the item for which funds are requested has been denied by the Congress." 132 Stat. at 2999.  In my view, the Secretary's transfers did not violate this condition.

Determining whether Congress "denied" the relevant "item" at issue here turns on the meaning of the phrase "the item for which funds are requested."  According to the States, the relevant "item" should be broadly defined to include any "border barrier construction," and Congress should be held to have "denied" that item except to the extent that it appropriated funds for "primary pedestrian fencing" in § 230(a)(1) of the Department of Homeland Security Appropriations Act, 2019, *see* Pub. L. No. 116-6, Div. A, § 230(a)(1), 133 Stat. 13, 28 (2019).  The States' reading is implausible, because it ignores the context of the appropriations process that § 8005 addresses.

As a provision designed to preserve Congress's authority over the appropriations process, § 8005's restriction on transfers can only be understood against the backdrop of that process and of the role of transfers and reprogrammings in it. *Home Depot U.S.A., Inc. v. Jackson*, 139 S. Ct. 1743, 1748 (2019) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.") (simplified). That process is usefully set forth in Chapter 2 of the GAO's authoritative *Principles of Federal Appropriations Law*, otherwise known as the "Red Book," and I borrow heavily from that treatise in setting forth that relevant context. *See Lincoln*, 508 U.S. at 192 (citing Red Book in addressing suit challenging reallocation of funds).

While Congress ordinarily appropriates funds annually for agencies to use in specified amounts for enumerated purposes, Congress has also recognized that "a certain amount of flexibility" is sometimes warranted. *See* 2 U.S. GOV'T ACCOUNTABILITY OFF. ("GAO"), PRINCIPLES OF FEDERAL APPROPRIATIONS LAW (4th ed. 2016 rev.) ("RED BOOK"), pt. B, § 7, 2016 WL 1275442, at *1. Two ways in which such flexibility may be achieved are through "transfer and reprogramming." *Id*. A "transfer"—which is the specific subject of § 8005—refers to "the shifting of funds between appropriations," and it is generally prohibited in the absence of specific statutory authority. *Id*.; *see also* 31 U.S.C. § 1532. By contrast, a "reprogramming shifts funds *within* a single appropriation," and in the absence of specific statutory limitations on reprogramming, agencies have broad discretion to do so "as long as the resulting obligations and expenditures are consistent with the purpose restrictions applicable to the appropriation." *See* RED BOOK, 2016 WL 1275442, at *6 (emphasis added) (citing *Lincoln*, 508 U.S. at 192). In

contrast to a transfer—which is easy to identify, because it shifts funds between separate appropriations that are "well-defined and delineated with specific language in an appropriations act"—it is more difficult to identify what counts as a reprogramming within an appropriation, because the appropriations act itself "does not set forth the subdivisions that are relevant to determine whether an agency has reprogrammed funds." *See id.* at *6. There is only a need to identify a "reprogramming" when Congress has sought to place limits on an agency's ability to do so. *See*, *e.g.*, Pub. L. No. 111-80, § 712, 123 Stat. 2090, 2120–21 (2009) (requiring 15-days advance notice to Congress before certain "reprogramming[s] of funds" may be made by various agriculture-related agencies). In such cases, whether a shift of funds within an appropriation counts as a reprogramming is ordinarily determined by considering how the reallocation of funds compares to the allocation of funds that was contemplated during the appropriations process: "Typically, *the itemizations and categorizations in the agency's budget documents* as well as statements in committee reports and the President's budget submission, contain the subdivisions within an agency's appropriation that are relevant to determine whether an agency has reprogrammed funds." RED BOOK, 2016 WL 1275442, at *7 (emphasis added). GAO's Red Book illustrates the point with an example, drawn from a prior opinion letter:

> For instance, for FY 2012, the Commodity Futures Trading Commission (CFTC) received a single lump-sum appropriation. *Id.* CFTC's FY 2012 *budget request* included an *item* within that lump sum to fund an Office of Proceedings. A reprogramming would occur if CFTC shifted amounts that it had

> previously designated to carry out the functions of the Office of Proceedings to carry out *different* functions.

*Id*. (citing GAO, B-323792, *Commodity Futures Trading Commission—Reprogramming Notification* (Jan. 23, 2013)) (emphasis added).

Against this backdrop, the import of § 8005's first proviso is clear. In evaluating a transfer from one appropriation to another, the Secretary must justify the transfer, not at the broad level of each overall appropriation itself (*i.e.*, not by comparing the statutory appropriation category for "Drug Interdiction and Counter-Drug Activities, Defense" versus that for "Military Personnel, Army"), but rather at the same "*item*" level at which the Secretary would have to justify a reprogramming within an appropriation. *See* Pub. L. No. 115-245, Div. A, § 8005, 132 Stat. at 2999 (requiring Secretary to compare whether the item to which the transferred funds will be directed is a "higher priority" than the items "for which originally appropriated"). The point of reference for determining whether the destination "item" justifies the transfer is therefore, as with a reprogramming, "the itemizations and categorizations in the agency's budget documents as well as statements in committee reports and the President's budget submission." RED BOOK, 2016 WL 1275442, at *7.

Several features of the language of § 8005 confirm this reading. The statutory reference to "those [items] for which *originally* appropriated," 132 Stat. at 2999 (emphasis added), is unmistakably a reference to the familiar concept of the itemizations contained *within* the current appropriation, as set forth in the already existing budgetary documents exchanged

and generated during the appropriations process for DoD. *Air Wisconsin Airlines Corp. v. Hoeper*, 571 U.S. 237, 248 (2014) ("It is a cardinal rule of statutory construction that, when Congress employs a term of art, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it is taken.") (simplified). And because those "original[]" items are to be compared with the new "items" for which the transfer authority is to "be used," 132 Stat. at 2999, these latter "items" must likewise be understood as a reference to the destination items *within* the transferee DoD appropriation. *Law v. Siegel*, 571 U.S. 415, 422 (2014) ("[W]ords repeated in different parts of the same statute generally have the same meaning").

The destination item is also referred to in the statute as "the item for which funds are *requested*," which is an unusual way to refer to a transfer that an agency approves on its own. 132 Stat. at 2999 (emphasis added). But the use of that term makes perfect sense when the language is again construed against the background of the appropriations process, because it is a common practice for agencies—despite the decision in *INS v. Chadha*, 462 U.S. 919 (1983)—to "request" the appropriations committees' approval for transfers and reprogrammings as a matter of comity. *See Lincoln*, 508 U.S. at 193 ("[W]e hardly need to note that an agency's decision to ignore congressional expectations [concerning the use of appropriations] may expose it to grave political consequences"). That reading is confirmed by § 8005's third proviso, which enforces the exclusivity of the first proviso by barring DoD from using any appropriated funds to "prepare or present a *request* to the Committees on Appropriations for reprogramming of funds," unless it meets the requirements of the first proviso. 132 Stat. at 2999 (emphasis added). This

language also confirms what is already otherwise apparent, which is that any transfer under § 8005 is to be analyzed, and papered, as a request for "*reprogramming* of funds." *Id*. (emphasis added). Indeed, although DoD made a conscious decision to depart from the comity-based practice of making a request in this case, the House Committee on Appropriations nonetheless proceeded to construe DoD's notification of the transfer as a "requested reprogramming action" and "denie[d] the request." *See* House Comm. on Appropriations, *Press Release: Visclosky Denies Request to Use Defense Funds for Unauthorized Border Wall* (Mar. 27, 2019), https://appropriations.house.gov/news/press-releases/visclosky-denies-request-to-use-defense-funds-for-unauthorized-border-wall.

For all of these reasons, the "items" at issue under § 8005 must be understood against the backdrop of the sort of familiar item-level analysis required in a budgetary reprogramming, and the benchmark for evaluating the proposed destination item is therefore, as with any reprogramming, the *original* allocation among items that is reflected in the records of the DoD appropriations process. Accordingly, when § 8005 requires a consideration of whether "the item for which funds are requested has been denied by the Congress," it is referring to whether Congress, *during DoD's appropriations process*, denied an "item" that corresponds to the "item for which funds are requested." Under that standard, this case is easy. The States do not contend (and could not contend) that Congress ever "denied" such an item to DoD during DoD's appropriations process.

Instead, the States argue that a grant of funds to *another* agency (DHS) in its appropriations, in an amount less than that agency requested, should be construed as a *denial* of an

analogous item to DoD under its entirely separate authorities and appropriations. This disregards the appropriations-law context against which § 8005 must be construed, which makes clear that the relevant clause refers only to denials that are applicable to DoD within the context of *its* appropriations process. Taking into account the broader context of the political struggle between the President and the Congress over DHS's requests for border-barrier funding, the majority concludes that Congress thereby issued a "general denial" of "border wall" funding, which should be construed as "necessarily encompass[ing] narrower forms of denial—such as the denial of a Section 284 budgetary line item request." *See* Maj. Opin. at 46–47. But § 8005's proviso only applies if, during the DoD appropriations process, such an item "has been denied by the Congress," 132 Stat. at 2999, and that manifestly did not occur here, given that (1) no such request was presented and denied during that process; and (2) indeed, that process *ended* several months *before* the ultimate "denial" that the majority claims we should now retroactively apply to DoD's transfer authority.

More fundamentally, the majority is quite wrong in positing that § 8005 assigns to us the task of discerning the contours of the larger political struggle between the President and the Congress over border-barrier funding (including by reviewing campaign speeches and the like), *see* Maj. Opin. at 39, and then giving legal effect to what we think, based on that review, is "Congress's broad and resounding denial resulting in a 35-day partial government shutdown," *id*. at 47. Our job under § 8005 is the more modest one of determining whether a proposed item of DoD spending was presented to Congress, and "denied" by it, during DoD's appropriations process, and all agree that that did not occur here. Any action that Congress took in the separate appropriations process

concerning DHS would create a "denial" as to DoD only if there is some language in the DHS Appropriations Act that somehow extends that Act's denial vis-à-vis DHS to *other* agencies.[21]  But the only relevant limitation in that Act that even arguably extends beyond DHS is a prohibition on the construction of "pedestrian fencing" in five designated parks and refuge areas, *see* Pub. L. No. 116-6, Div. A, § 231, 133 Stat. at 28 ("None of the funds made available by this Act *or prior Acts* are available" for such construction) (emphasis added), but no one contends that this limitation is being violated here.  Beyond that, it is not our role under § 8005 to give effect to a perceived big-picture "denial" that we think is implicit in the "real-world events in the months and years leading up to the 2019 appropriations bills."  *Sierra Club v. Trump*, 929 F.3d at 691.

**B**

The majority alternatively holds that, even if Congress did not deny the "item" in question, the transfers were still unlawful because the requirements invoked by the Secretary here to justify the transfers were neither "military" in nature nor "unforeseen."  *See* Maj. Opin. at 37–46.  The majority is wrong on both counts.

---

[21] Nor is this a situation in which DoD is invoking the transfer authority to move funds *into DHS's appropriations*.  The destination item here involves the authority under § 284 for *DoD* to undertake "[c]onstruction of roads and fences" along the border.  10 U.S.C. § 284(b)(7).  Indeed, § 8045(a) of the DoD Appropriations Act specifically forbids DoD from "transferr[ing] to any other department" any funds available to it for "counter-drug activities," except "as specifically provided in an appropriations law."  132 Stat. at 3012.

**1**

The DoD's provision of support for counterdrug activities under § 284 is plainly a "military" requirement within the meaning of § 8005. As the majority notes, § 8005 does not define the term "military," *see* Maj. Opin. at 42, and so the word should be given its ordinary meaning. *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995). In common parlance, the word "military" simply means "[o]f, relating to, or involving the armed forces." *Military*, BLACK'S LAW DICTIONARY (11th ed. 2019); *see also Military*, AMERICAN HERITAGE DICTIONARY (5th ed. 2018) ("Of, relating to, or characteristic of members of the armed forces"; "Performed or supported by the armed forces"); *Military*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1961) ("WEBSTER'S THIRD") ("of or relating to soldiers, arms, or war"; "performed or made by armed forces"). Because Congress, by statute, has formally assigned to DoD the task of providing "support for the counterdrug activities" of other departments through the "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States," 10 U.S.C. § 284(a), (b)(7), that task "relat[es] to" and "involv[es] the armed forces," and is "[p]erformed or supported by the armed forces." As such, it is a "military" task.[22]

---

[22] The majority is wrong in suggesting that the Government has never argued that the construction projects "are related to the use of soldiers." *See* Maj. Opin. at 42. The Government affirmatively argues in its brief that "the *military* may be, and here is, required to assist in combatting" drug trafficking under § 284 (emphasis added). Moreover, the evidence submitted to the district court showed that the construction was to be carried out by the U.S. Army Corps of Engineers. Even granting that most of that agency's employees are civilians, the agency remains within the

Two other textual clues support this conclusion.  First, the chapter heading for the chapter of Title 10 that includes § 284 is entitled, "*Military Support* for Civilian Law Enforcement Agencies," thereby further confirming that the support authorized to be provided under § 284 counts as *military* support.  *See Henderson v. Shinseki*, 562 U.S. 428, 439 (2011) (title of subchapter aided in resolving ambiguity concerning provision in that subchapter).  Second, the DoD Appropriations Act *itself* classifies the activities carried out under § 284 as "military" activities.  The Act recognizes, on its face, that funds appropriated for "Drug Interdiction and Counter-Drug Activities, Defense," may be transferred *out* of that appropriation under § 8005.  *See* DoD Appropriations Act, § 8007(b)(6), 132 Stat. at 3000 (exempting transfers of funds out of this appropriation from an otherwise applicable prohibition on transferring funds under § 8005).  Given that the transfer authority granted by § 8005 applies *only* to "funds made available in this Act to the Department of Defense for *military* functions (except military construction)," 132 Stat. at 2999 (emphasis added), the Act necessarily deems funds in the "Drug Interdiction and Counter-Drug Activities, Defense" appropriation to be for "military functions."  The majority's insistence that such counter-drug functions are not "military" activities thus flatly contradicts the statute itself.

The majority is also wrong in relying on the distinctive definition given in 10 U.S.C. § 2801 for the phrase "military construction."  *See* Maj. Opin. at 44–45.  At the outset, this makes little sense, because § 8005 states on its face that it applies only to transfers between appropriations for "military *functions*" and *not* for "military construction."   132 Stat.

---

Department of the Army and is led by a military officer.  *See* 10 U.S.C. §§ 7011, 7036, 7063.

at 2999 (emphasis added). Indeed, Congress has long handled appropriations for "military construction" separately from those for military functions, and it did so again for Fiscal Year 2019: appropriations for "military construction" were made in a *separate* appropriations statute enacted one week before the DoD Appropriations Act. *See* Pub. L. No. 115-244, Div. C, Title I, 132 Stat. 2897, 2946 (2018). Of all the terms to consider in construing "military" for purposes of the DoD Appropriations Act, "military construction" may be the least appropriate.

Moreover, the majority fails to recognize that "military construction" is a term of art, with its own unique definition, and it therefore provides an inapt guide for trying to discern the meaning of "military" in a different phrase in a different context. Absent a special definition, one would have thought that the phrase "military construction" embraces any "construction" that is performed by or for the "military." *See supra* at 94 (quoting definitions of "military"). But § 2801 more narrowly defines "military construction" as generally referring only to "construction . . . carried out with respect to a military installation . . . or any acquisition of land or construction of a defense access road," and it defines a "military installation" as a "base, camp, post, station, yard, center, or other activity under the jurisdiction of the Secretary of a military department." 10 U.S.C. § 2801(a), (c)(4). Nothing about this distinctive definition of "military construction" creates or reflects a general gloss on the word "*military*," much less does it suggest that the ordinary meaning of "military" in other contexts carries all of this baggage with it. The majority's effort to import the specific features of this term of art ("military construction") into one of the *component* words of that phrase makes neither linguistic nor logical sense, and it is therefore irrelevant

whether or not the § 284 activities at issue here meet that definition.[23]

The majority also contends that, even if the activities involved here are "military" ones, they still did not involve "military *requirements*." *See* Maj. Opin. at 45–45 (emphasis added). That is wrong. The term "requirement" is not limited to those tasks that DoD is *compelled* to undertake, nor is it limited to those actions that DoD undertakes *for itself*. The term also includes "something that is wanted or needed" or "something called for or demanded," *see Requirement*, WEBSTER'S THIRD; *see also Requirement*, BLACK'S LAW DICTIONARY (11th ed. 2019) (listing, as an alternative definition, "[s]omething that someone needs or asks for"), and that readily applies to the request for assistance that was made to DoD in this case under § 284. We should be

---

[23] The majority notes that the phrase "military construction" is used in 10 U.S.C. § 2808, which "[t]he Federal Defendants have also invoked . . . to fund other border wall construction projects on the southern border." Maj. Opin. at 44. But that statute was invoked only with respect to a *different* set of funds to be used for activities that Defendants contend *do* qualify as "military construction" for purposes of DoD's additional construction authority after a declaration of a national emergency. *See* 10 U.S.C. § 2808(a). The States also challenged the use of that separate set of funds in their suit below, but these challenges form no part of the Rule 54(b) partial judgment now before us, and any issue concerning them has no bearing on the distinct questions presented here. Relatedly, the President's proclamation declaring such an emergency is relevant only to that other set of funds and has no legal bearing on the Secretary's transfers here. *Cf.* Maj. Opin. at 12–13, 39 (discussing the declaration). And Congress's joint resolutions attempting to terminate the emergency declaration, *see id*. at 39, are irrelevant for the further reason that they were vetoed and never became law. *See id*. at 12 n.3; *see also* 50 U.S.C. § 1622(a)(1) (congressional termination requires "enact[ing] into law a joint resolution terminating the emergency"); *Chadha*, 462 U.S. at 946–48.

cautious before adopting an unduly crabbed reading of what constitutes a military "requirement," especially when Congress has explicitly assigned a task to the military, as it did in § 284. *Cf. Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008) ("great deference" is generally given to the military's judgment of the importance of a military interest).

Accordingly, DoD's provision of support to DHS under § 284 involves a "military requirement[]" within the meaning of § 8005. The majority errs in concluding otherwise.

**2**

The majority is likewise wrong in contending that DoD's need to provide assistance to DHS for these projects under § 284 was not "unforeseen" within the meaning of § 8005. *See* Maj. Opin. at 37–42.

Once again, the majority fails to construe § 8005 against the backdrop of the appropriations process. In ordinary usage, "foresee" means "to see (as a future occurrence or development) as *certain or unavoidable*: look forward to *with assurance*." *Foresee*, WEBSTER'S THIRD (emphasis added). In the context of the appropriations process, an "item" has been *seen as certain or unavoidable* only if it is reflected in DoD's budgetary submissions or in Congress's review and revision of those submissions. Conversely, it is "unforeseen" if it is *not* reflected as an item in any of those materials. The Red Book confirms this understanding. In explaining the need for reprogramming, it quotes the Deputy Defense Secretary's statement that reprogramming allows agencies to respond to "unforeseen changes" that *are not reflected in the*

*"budget estimates"* on which the final appropriations are based:

> "The defense budget does not exist in a vacuum. There are forces at work to play havoc with even the best of budget estimates. The economy may vary in terms of inflation; political realities may bring external forces to bear; fact-of-life or programmatic changes may occur. The very nature of the lengthy and overlapping cycles of the budget process poses continual threats to the integrity of budget estimates. Reprogramming procedures permit us to respond to these unforeseen changes and still meet our defense requirements."

RED BOOK, 2016 WL 1275442, at \*5 (citation omitted). As the GAO has explained, the question is not whether a particular item "was unforeseen *in general*"; "[r]ather, the question under section 8005 is whether it was unforeseen at the time of the budget request and enactment of appropriations." U.S. GAO, B-330862, *Department of Defense—Availability of Appropriations for Border Fence Construction* at 7–8 (Sept. 5, 2019) (emphasis added), https://www.gao.gov/assets/710/701176.pdf. Under this standard, the items at issue here were "unforeseen"; indeed, the States do not contend that funding for the DoD assistance at issue here was ever requested, proposed, or considered during DoD's appropriations process.

In reaching a contrary conclusion, the majority makes two legal errors. First, it makes precisely the mistake the GAO identified, namely, it examines whether the "problem" (drug

smuggling) and the "solution" (a border barrier) were foreseen *in general*, rather than whether they were foreseen *within the appropriations process*. *See* Maj. Opin. at 40–41. Thus, in concluding that DoD's need to provide assistance under § 284 was not "unforeseen," the majority relies on the general premises that "the conditions at the border" have been known to be a problem since at least the 1960s and that "the President's position that a wall was needed to address those conditions" was publicly known well before he took office. *Id*. at 35, 37. Second, by rejecting the view that "foreseen" is equivalent to "known" or that it requires "actual knowledge," *id*. at 39–40, the majority effectively rewrites the statute as if it said "*foreseeable*" rather than "foreseen." Contrary to the majority's view that requiring foreknowledge would "effectively eliminate[] any element of anticipation or expectation," *see id*. at 39, "foreseen" is commonly understood to be interchangeable with "foreknown." *See, e.g.*, *Foresee*, WEBSTER'S THIRD (listing "foreknow" as a synonym). By wrongly shifting the focus away from whether a current need matches up with the assumptions on which the budget and appropriations were based, the majority's errors would preclude DoD from making transfers based on *any* factors that were anticipated within the larger society and, as a result, would essentially reduce the transfer power in § 8005 to a nullity.

**3**

DoD's transfers here were thus based on "military" "requirements" that were "unforeseen" within the meaning of § 8005. The States do not otherwise contest the Secretary's determination that the items in question were "higher priority" items than "those for which originally

appropriated." This element of § 8005's first proviso was therefore also satisfied here.

## C

The States contend that, even if the transfers complied with the conditions in § 8005, the particular transfer that was made under § 9002, *see supra* at 52–53, did not satisfy that section's additional requirement that transfers under that section be made only "between the appropriations or funds made available to the Department of Defense *in this title*." 132 Stat. at 3042 (emphasis added). According to the States, the appropriations under that title are only for "Overseas Contingency Operations," and the transferee appropriation does not count. This argument is plainly incorrect. The separate title in the DoD Appropriations Act that is entitled "Overseas Contingency Operations" contains within it a specific appropriation for "Drug Interdiction and Counter-Drug Activities, Defense," 132 Stat. at 3042, which is the appropriation to which the funds were transferred. The fact that the amounts in that fund are designated as funds for "Overseas Contingency Operations/Global War on Terrorism" *for purposes of calculating budgetary caps* under § 251(b)(2)(A)(ii) of the Balanced Budget and Emergency Deficit Control Act of 1985, 2 U.S.C. § 901(b)(2)(A)(ii), does not thereby impose an additional limitation on the purposes for which such funds may be expended.

## V

Based on the foregoing, I conclude that at least California has Article III standing, but that the States lack any cause of action to challenge these § 8005 and § 9002 transfers. Alternatively, if the States did have a cause of action, their

claims fail on the merits as a matter of law because the transfers complied with the limitations in § 8005 and § 9002. I therefore would reverse the district court's partial grant of summary judgment to the States and would remand the matter with instructions to grant the Government's motion for summary judgment on this set of claims. Because the majority concludes otherwise, I respectfully dissent.